UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

KENTUCKY CHAMBER OF COMMERCE;    )
CHAMBER OF COMMERCE OF THE    )
UNITED STATES OF AMERICA;    )
ASSOCIATED GENERAL CONTRACTORS OF    )
KENTUCKY, INC.;    )
HOME BUILDERS ASSOCIATION OF KENTUCKY;    )
PORTLAND CEMENT ASSOCIATION; and    )
GEORGIA CHAMBER OF COMMERCE,    )
    )
          Plaintiffs,    )
    )
v.    )
    )
UNITED STATES ENVIRONMENTAL PROTECTION    )
AGENCY;    )
MICHAEL S. REGAN, in his official capacity as    )
Administrator of the United States Environmental    )
Protection Agency;    )
UNITED STATES ARMY CORPS OF ENGINEERS, and    )
MICHAEL CONNOR, in his official capacity as Assistant    )
Secretary of the Army (Civil Works),    )
    )
          Defendants.    )
    )

_____

## COMPLAINT

       The Kentucky Chamber of Commerce, the Chamber of Commerce of the United States of

America, Associated General Contractors of Kentucky, Inc., Home Builders Association of

Kentucky, Portland Cement Association, and the Georgia Chamber of Commerce bring this civil

action against the United States Environmental Protection Agency ("EPA"); Michael S. Regan,

in his official capacity as Administrator of the United States Environmental Protection Agency;

the United States Army Corps of Engineers ("Corps"); and Michael Connor, in his official

capacity as Assistant Secretary of the Army for Civil Works (collectively, "Defendants"), and for its claims against them state and allege as follows:

## <u>INTRODUCTION</u>

1.     This case is about the latest attempt by two federal agencies to assert control over millions of miles of waters (from creeks and wetlands to ponds and dry land where water sometimes flows) and over millions of square acres of land (from state lands to farms to backyards) within some undefined geographic distance from those waters.  This effort, embodied in a novel final rule, far exceeds the agencies' statutory authority and is unconstitutional.  The rule undermines the basic role of the states in our federal system of government.  And it introduces even more regulatory uncertainty into an area already rife with confusion.  What is more, the agencies audaciously issued the Rule at a time when the Supreme Court is considering the very question at the heart of the rule: what is meant by the statutory term "waters of the United States"?

2.     The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act" or "CWA"), grants the Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("Corps") (collectively, the "Agencies") regulatory authority over "navigable waters," which the statute defines as "waters of the United States, including the territorial seas." *Id.* §§ 1344, 1362(7).  The statutory language and Supreme Court precedent make clear that this term does not extend to every body of water or stream found in the United States; instead, the term encompasses only a subset of such waters.

3.     In promulgating the CWA, Congress instructed the Agencies to protect the integrity of the nation's waters and in so doing to also "recognize, preserve, and protect the

primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." *Id.* § 1251(a), (b).

4.      The Supreme Court has twice before rejected the Agencies' attempts to assert their regulatory authority to cover non-navigable, intrastate waters, notwithstanding the Agencies' claim that such waters had important effects on the chemical, physical, and biological integrity of the nation's waters. *See Rapanos v. United States*, 547 U.S. 715 (2006); *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*").

5.      In 2015, the Agencies again attempted to define "waters of the United States" by rule. Among other things, that rule declared large categories of wholly intrastate waters, including minor roadside ditches, ephemeral streams, creeks, ponds, and streams where water may flow once every one hundred years, subject to federal jurisdiction.

6.      The 2015 Rule was found unlawful by two district courts. *Texas* v. *U.S. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019); *Georgia* v. *Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019).

7.      The present case involves the Agencies' latest overreach—Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule").

8.      This time the Final Rule purports to return to the status quo of the pre-2015 era, but in fact, yet again reaches much more broadly to cover the same types of isolated and remote waters over which the Supreme Court rejected federal jurisdiction in *Rapanos* and *SWANCC*.  In reality, the Final Rule reaches many of the same intrastate, isolated waters over which the Agencies unlawfully declared jurisdiction in 2015.

9.      Once more, the Agencies have exceeded their power.  The Final Rule is inconsistent with the Clean Water Act, the Administrative Procedure Act ("APA"), the Regulatory Flexibility Act ("RFA"), and the U.S. Constitution.

10. The Agencies have pushed forward despite the fact that the Supreme Court has granted certiorari and heard argument in a case that is likely to provide specific direction on the scope of their power under the Clean Water Act. *Sackett v. EPA*, 142 S. Ct. 896 (Jan. 24, 2022).

11. As a result of the Final Rule, Plaintiffs' members will suffer real and immediate economic harm to their businesses and property values. Before they can perform routine activities on their property, they will be forced to submit to an expensive, burdensome, and time-consuming permitting process, including by hiring consultants and other experts to interpret and apply the Agencies' regulations to understand whether their land is newly subject to federal jurisdiction. Numerous landowners and businesses, representing a range of vocations and industries, will experience the detrimental effects of the Final Rule. Making matters worse, the Final Rule makes clear that the Agencies do not intend to honor jurisdictional determinations ("JDs") (determinations identifying the presence or absence of waters of the United States on specific parcels of land) that they made and approved under the previously effective rule, notwithstanding private parties' reliance on (and investments made in obtaining) these authoritative determinations.

12. Plaintiffs respectfully request that this Court enter a declaratory judgment pronouncing the Final Rule invalid and an order vacating and setting aside the Final Rule in its entirety, pursuant to 5 U.S.C. § 706, as well as an injunction prohibiting the Agencies from enforcing the Final Rule, pursuant to 28 U.S.C. § 2202.

## JURISDICTION AND VENUE

13. This case arises under the APA, 5 U.S.C. §§ 701–706, and under the Constitution and laws of the United States.

14.     The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. The Final Rule is final agency action, and the Plaintiffs have no other adequate remedy available in court.

15.     This Court has federal question jurisdiction under 28 U.S.C. § 1331.

16.     This Court has subject matter jurisdiction to review the Final Rule because this challenge to the Final Rule is not one of the actions deemed by section 509(b) of the CWA, 33 U.S.C. § 1369(b)(1), to be exclusively within the jurisdiction of the courts of appeals. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018).

17.     This Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705–706, as well as 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

18.     Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because the Kentucky Chamber of Commerce, the Associated General Contractors of Kentucky, and the Home Builders Association of Kentucky are located in this judicial district, the Defendants are officers or agencies of the United States, and "waters of the United States" jurisdictional determinations under the Final Rule will be made by federal officials in the district.

19.     Under Local Rules 3.2(a)(3) and 8.1, the Central Division of the Eastern District of Kentucky at Frankfort is the proper division for this action because the Kentucky Chamber of Commerce is located in Frankfort, Kentucky.

**THE PARTIES**

20.     The Kentucky Chamber of Commerce ("Kentucky Chamber") is a non-profit organization founded in 1947. The Chamber is the Commonwealth's largest business association and is a major catalyst, consensus builder and advocate for a thriving economic climate in Kentucky. It represents the interests of more than 65,000 employers of every size, in every

industry sector, and from every region of the Commonwealth. The Kentucky Chamber of Commerce supports a prosperous business climate in the Commonwealth of Kentucky and works to advance Kentucky through advocacy, information, program management and customer service in order to promote business retention and recruitment. The Chamber brings this action on behalf of its members. The Kentucky Chamber has its headquarters in Frankfort, Kentucky, in Franklin County.

21.     Plaintiff Chamber of Commerce of the United States of America ("Chamber" or "U.S. Chamber") is a non-profit organization created and existing under the laws of the District of Columbia. The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. The Chamber brings this action on behalf of its members.

22.     The Portland Cement Association, founded in 1916, is the premier policy, research, education, and market intelligence organization serving America's cement manufacturers. The Association promotes safety, sustainability, and innovation in all aspects of construction, fosters continuous improvement in cement manufacturing and distribution, and generally promotes economic growth and sound infrastructure investment. The cement and concrete industry, directly and indirectly, employs more than 600,000 people in the U.S., contributes more than $100 billion to our economy each year, and is playing a key role in President Biden's plan to improve the nation's infrastructure.

23.     The Associated General Contractors of Kentucky ("AGC of Kentucky") is a non-profit organization created and existing under the laws of the Commonwealth of Kentucky. AGC of Kentucky is the Commonwealth's leading commercial construction association, representing a membership of over 500 construction contractors, suppliers, and service providers. AGC of Kentucky's members are engaged in the construction of Kentucky's commercial buildings, shopping centers, manufacturing facilities, hospitals, warehouses, airports, waste treatment facilities, dams, and multi-family housing projects. The AGC of Kentucky has its headquarters in Frankfort, Kentucky, in Franklin County, and is affiliated with the Associated General Contractors of America. AGC of Kentucky's members perform construction activities that require compliance with the CWA and are directly involved in the CWA permitting process.

24.     The Home Builders Association of Kentucky ("HBAK") is a statewide trade association comprised of more than 4,000 member companies which includes individuals and firms that construct single-family homes, apartments, condominiums, and light commercial projects, as well as land developers and remodelers. Other members work in closely related specialties such as sales and marketing, housing finance, and manufacturing and supplying building materials. Formed in 1957, HBAK was established to provide a voice for the housing and residential construction industry in Kentucky's legislative and regulatory environment. HBAK has its headquarters in Frankfort, Kentucky, in Franklin County.

25.     The Georgia Chamber of Commerce ("Georgia Chamber") serves the unified interests of its nearly  50,000 members – ranging in size from small businesses to Fortune 500 corporations – covering a diverse range of industries across all of Georgia's 159 counties. The Georgia Chamber is the State's largest business advocacy organization and is dedicated to representing the interests of both businesses and citizens in the State. Established in 1915, the

Georgia Chamber's primary mission is creating, keeping and growing jobs in Georgia. The Georgia Chamber pursues this mission, in part, by aggressively advocating the businesses and industry viewpoint in the shaping of law and public policy in an effort to ensure that Georgia is economically competitive nationwide and in the global economy.

26.     On December 7, 2021, the Agencies published in the Federal Register a proposed rule entitled "Revised Definition of 'Waters of the United States'" ("Proposed Rule"). 86 Fed. Reg. 69,372–69,450 (Dec. 7, 2021).  The U.S. Chamber (of which the Georgia and Kentucky Chambers are members) submitted comments on the Proposed Rule on February 7, 2022.[1] The U.S. Chamber of Commerce also joined the comments of the Waters Advocacy Coalition ("WAC"), of which the U.S. Chamber is a member.[2] The Portland Cement Association submitted individual comments and joined coalition comments with the National Ready Mix Concrete Association, National Stone, Sand & Gravel Association, and the National Asphalt Pavement Association.[3] The Georgia Chamber also submitted comments.[4] These comments raised numerous legal and policy concerns about the substance of the Proposed Rule.

27.     The Final Rule will injure Plaintiffs' members.  Dozens of industries in which Plaintiffs' members operate will be adversely affected by the Final Rule, including but not limited to manufacturing, mining, asphalt production, food production, pulp and paper

---

[1] *Comments of the Chamber of Commerce of the United States of America on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[2] *Comments of the Waters Advocacy Coalition (WAC) on the U.S. Environmental Protection Agency's and U.S. Army Corps of Engineers' Proposed Revised Definition of "Waters of the United States,"* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022) (corrected Feb. 9, 2022).

[3] *Comments of the Portland Cement Association on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021),* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022); *Comments of the National Stone, Sand & Gravel Association, National Asphalt Pavement Association, National Ready Made Concrete Association and the Portland Cement Association on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[4] *Comments of the Georgia Chamber of Commerce on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

production, paint manufacturing, electricity production, energy development, water utilities, sand, stone, and gravel operations, road construction and maintenance, landfills, real estate development, railroads, industrial development, and agriculture.

28.     Defendant Michael S. Regan is the Administrator of the United States Environmental Protection Agency. Defendant, United States Environmental Protection Agency ("EPA") is an agency of the United States within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1). The Administrator and EPA are charged with administering many provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act" or "CWA").

29.     Defendant Michael Connor is the Assistant Secretary of the Army for Civil Works, who establishes policy direction and provides supervision of Department of the Army functions relating to all aspects of the U. S. Army Corps of Engineers' Civil Works program. Defendant, United States Army Corps of Engineers ("the Corps") is an agency of the United States within the meaning of the Administrative Procedure Act. *See* 5 U.S.C. § 551(1). The Secretary of the Army and the Corps are charged with administering many provisions of the Clean Water Act. 33 U.S.C. §§ 1251–1387.

30.     The relief requested in this action is sought against the Defendants and their officers, employees, and agents.

## STANDING

31.     Plaintiffs have associational standing to bring this suit on behalf of their various members.  Their members are directly and adversely affected by the Final Rule and accordingly have standing to sue in their own right.  The Final Rule is at odds with each of Plaintiffs' policy

objectives, and challenging the Final Rule is germane to each Plaintiffs' purposes. Neither the claims asserted nor the relief requested requires individual members to participate in the suit.

32.     Plaintiffs have standing as member organizations whose members have standing, and independently, has organizational standing.

33.     The interests that Plaintiffs seek to protect in this lawsuit are germane to their organizational purposes. Plaintiffs' members engage in a wide variety of activities that are directly impacted by the Final Rule. Each Plaintiff has as a primary purpose to represent and protect the interests of its members in advocacy in many forms at the state and federal levels.

34.     Plaintiffs' members own or work on land, or facilitate the sale of real property, that include features that may constitute "waters of the United States" under the Final Rule. Plaintiffs' members must comply with the CWA, and the Plaintiffs advise their members and advocates on such issues.  Moreover, Plaintiffs assist their members in determining how the CWA may affect their ownership and use of the subject property.

35.     If the Final Rule takes effect, Plaintiffs' members will immediately be deterred, at the risk of incurring substantial civil and even criminal penalties, from conducting routine activities on large portions of their property unless they go through an expensive, vague, and time-consuming regulatory process (in some instances, to obtain relevant permitting approvals; in other instances, to investigate and confirm whether the Final Rule requires such approvals). Adding to the challenge is the Agencies' repeated shifts in regulatory positions over the past decade, a phenomenon that has been exacerbated by the Agencies' decision to issue a new rule at the same time the Supreme Court is poised to provide greater clarity, as well as their express refusal, set forth in the rule, to honor previously approved jurisdictional determinations. 88 Fed. Reg. at 3,136. The burdens imposed by the Agencies' decisions will cause substantial harm to

Plaintiffs' members. In some cases, the costs and the delays occasioned by the new rule will be prohibitive, forcing Plaintiffs' members to abandon valuable projects and activities entirely.

36.     Obtaining a discharge permit is an expensive and uncertain process, which can take years and cost tens of thousands, or even hundreds of thousands, of dollars. *See* 33 U.S.C. §§ 1342, 1344 (describing the discharge permitting process); *see also* David Sunding & Gina Waterfield, Review of the Environmental Protection Agency and Department of the Army 2021 Economic Analysis for the Proposed "Revised Definition of 'Waters of the United States'" Rule, at 10 (Feb. 2022) (permitting costs range "from $3,100 to $217,600 for general permits and from $10,900 to $2,376,800 for individual permits in 2020 dollars.") (available at https://www.ipaa.org/wp-content/uploads/2022/02/2022-WAC-Final-Exhibit-10.pdf).

37.     The Act imposes civil and criminal liability for those who discharge materials into "waters of the United States" without obtaining the required permits. A single negligent violation of the Act can result in imprisonment for up to one year. 33 U.S.C. § 1319(c)(1). A second negligent violation may subject a person to imprisonment for up to two years. *Id.* EPA can also seek up to an amount of $56,460 each day for each civil violation in addition to criminal penalties. 40 C.F.R. § 19.4 Tb. 1, 85 Fed. Reg. 83,818, 83,820 Tbl. 1 (Dec. 23, 2020). Civil liability can accrue for "each day [the regulated party] wait[s] for the Agency to drop the hammer." *Sackett v. U.S. EPA*, 566 U.S. 120, 127 (2012). Even where the Agencies do not seek an enforcement action, other parties can bring citizen suits to seek penalties for what they assert is an unlawful discharge. Accordingly, the Agencies cannot claim to redress the final rule's overreach by promising to exercise enforcement discretion to the benefit of regulated parties.

38.     While the Agencies claim that the Final Rule merely codifies the pre-2015 status quo in terms of the scope of waters subject to these burdensome requirements, that is not the case, in several ways.

39.     In particular, the Final Rule extends the Agencies' regulatory jurisdiction to include a newly articulated "other waters" category, including intrastate lakes and ponds, streams, or wetlands that meet the Final Rule's significant nexus standard. 33 CFR § 328.3(a)(1)–(5). The significant nexus standard, as defined in the Rule, asks whether the water "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of a traditional navigable water, interstate water, or the territorial seas." *Id.* § 328.3(c)(6). "Significantly affect" means "a material influence" under the Rule. *Id.*

40.     In sum, the Final Rule imposes a new test for jurisdiction—the significant nexus standard—on a category of waters to which no similar standard applied under the previous regime.

41.     Even if the waters or wetlands are generally small, insubstantial, or isolated, the Final Rule will require Plaintiffs' members to assess whether such waters are "similarly situated" with water features "in the region" that have a material effect on a traditional navigable or interstate water. That is no simple exercise. Performing the assessment required by this new aspect of the Final Rule requires a party (or its retained expert) to determine what "waters are providing common, or similar, functions for" downstream waters and to ascertain what the Agencies will determine constitutes the relevant region. *See* 88 Fed. Reg. at 3,127. Thus, Plaintiffs' members must consider whether the Agencies will find a material influence based on a number of different arcane factors that require the assistance of experts.

42.     Numerous members of Plaintiffs will suffer hardships under the Final Rule because portions of their land will become subject to federal authority, particularly those waters that fall into the very broad "other waters" category to which the significant nexus standard did not previously apply, causing devaluation of their properties and preventing maintenance and growth of their businesses.

43.     Plaintiffs' members have standing to sue in their own right as parties regulated under the CWA.

44.     Neither the claims asserted nor the relief requested require individual members' participation in this lawsuit.

## FACTUAL ALLEGATIONS

45.     The Final Rule is the latest chapter in the Agencies' decades-long effort to give meaning to the phrase "Waters of the United States" in the Clean Water Act of 1972.

46.     As described below, the Agencies promulgated regulations in 1974, 1975, 1986, 2015, 2019, and 2020, as well as guidance in 1986, often in response to court decisions finding some part of the regulations unlawful.

47.     A key question over the years has been the propriety of including intrastate, non-navigable waters.

## I.     The Clean Water Act

48.     Congress passed the Clean Water Act ("CWA" or the "Act") in 1972.

49.     In the CWA, Congress granted to EPA and the Corps (collectively, "the Agencies") limited authority to regulate the discharge of certain materials into "navigable waters" through permitting programs. 33 U.S.C. §§ 1341–1346. The Act defines "navigable waters" as "the waters of the United States including the territorial seas." 33 U.S.C. § 1362(7).

50.     The objective of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act also states that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." *Id.* § 1251(b).

51.     One of the statute's principal provisions is 33 U.S.C. § 1311(a), which provides that "the discharge of any pollutant by any person shall be unlawful." "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12), and "pollutant" is defined broadly to include not only traditional contaminants but also solids such as "dredged soil, . . . rock, sand, [and] cellar dirt," *id.* § 1362(6).

52.     The CWA provides certain exceptions to its prohibition of "the discharge of any pollutant by any person." *Id.* § 1311(a). Section 1342(a) authorizes the EPA or the State to "issue a permit for the discharge of any pollutant, . . . notwithstanding section 1311(a) of this title." And section 1344 authorizes the Corps, to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a), (d).

53.     The CWA as part of its design of cooperative federalism also provides the ability for the states to take on the responsibility to issue permits in lieu of EPA and the Corps under sections 1342(b) and 1344(g). To date, 47 states have taken on permitting responsibilities under section 1342(b) and three states have assumed authority under section 1344(g).

**II.    The United States Supreme Court Twice Rejects The Agencies' Assertions Of Authority Over Intrastate, Non-Navigable Waters.**

54.    In 1974, the Corps issued a rule defining "waters of the United States" as those waters that have been, are, or may be, used for interstate or foreign commerce. 39 Fed. Reg. 12,119 (Apr. 3, 1974).

55.    After a federal district court enjoined the initial rule as too narrow, *Natural Resources Defense Council v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), the Agencies sought on remand to expand their regulatory jurisdiction to include new areas not previously subject to federal permitting requirements. 40 Fed. Reg. 31,320 (July 25, 1975). Those 1975 regulations defined "the waters of the United States" to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce. 40 Fed. Reg. 31,324–31,325 (July 25, 1975).

56.    In 1986, the Corps expanded its CWA jurisdiction even further by defining "the waters of the United States" to include traditional navigable waters, tributaries of those waters, wetlands adjacent to those waters and tributaries, and waters that are used in interstate commerce, which the Corps defined to include waters that serve as habitat for migratory birds that are either protected by treaties or cross state lines. *See* 51 Fed. Reg. 41,206 (Nov. 13, 1986). EPA promulgated materially identical regulations in 1988. 53 Fed. Reg. 20,764 (June 6, 1988).

57.    In *SWANCC*, the Supreme Court rejected the Corps' assertion of jurisdiction over all waters "'[w]hich are or would be used as habitat'" by migratory birds. *SWANCC*, 531 U.S. at 164 (quoting 51 Fed. Reg. at 41,217). The Court in *SWANCC* explained that "[t]he term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA; its traditional jurisdiction over waters that were or had been navigable in fact

or which could reasonably be so made." *Id.* at 172. Accordingly, Congress did not authorize the Agencies to regulate "nonnavigable, isolated, intrastate waters," like seasonal ponds. *Id.* at 171.

58. The Court continued to explain that regulation of such isolated waters would invoke "the outer limits of Congress' power," have the effect of "altering the federal-state framework by permitting federal encroachment upon a traditional state power," and raise "significant constitutional questions" regarding the Clean Water Act's constitutionality. *Id.* at 172–74. Congress, the Court concluded, did not intend to assert authority to the outer bounds of its constitutional authority or cause significant constitutional difficulty. *Id.*

59. In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court considered whether, and if so, under what circumstances, non-navigable tributaries of traditional navigable waters are within the Agencies' jurisdiction. The Court's majority consisted of two opinions, both rejecting the Agencies' position.

60. A four-Justice plurality opinion held that only "relatively permanent, standing or continuously flowing bodies of water," as well as secondary waters with a "continuous surface connection" to such relatively permanent waters, qualify as "waters of the United States." *Id.* at 739–42. "Wetlands with only an intermittent, physically remote hydrologic connection," the plurality explained, do not fall within the Agencies' jurisdiction. *Id.* at 742.

61. The plurality opinion explained that Congress' choice to use the definite article "the," along with the plural term "waters," indicates that Congress referred "not … to water in general" but "more narrowly" to "relatively permanent, standing or flowing bodies of water." *Id.* at 732. The opinion referred to the dictionary for the definition of "the waters" as referring to water "'[a]s found in streams and bodies forming geographical features such as oceans, rivers,

[and] lakes,'" and excluding "ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 733.

62.     Justice Kennedy, writing separately for himself, explained that the Agencies' jurisdiction extends only to primary "waters that are navigable in fact or that could reasonably be so made" and secondary waters with a "significant nexus" to primary waters. *Id.* at 779. To satisfy that nexus, secondary waters must "significantly affect the chemical, physical, and biological integrity of" primary waters. *Id.* at 780.

63.     Justice Kennedy stressed that the CWA would not allow the Agencies to assert jurisdiction over all "wetlands (however remote)" or "a continuously flowing stream (however small)." *Id.* at 776–77. Justice Kennedy added that the Agency's position would impermissibly "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

64.     Following *Rapanos*, the Agencies issued updated guidance explaining the approach they would use to determine whether waters are subject to the CWA. U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States* (Dec. 2, 2008).

65.     The Guidance asserted that the Agencies would exercise per se jurisdiction over certain categories of waters that were included in the 1986 regulations, such as waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce and interstate waters.

66.     The Agencies also asserted case-by-case jurisdiction over non-navigable tributaries that are not relatively permanent, and certain adjacent wetlands, if they were found to

have a significant nexus. The Guidance defined a significant nexus as a more than speculative or insubstantial effect on the chemical, physical, and biological integrity of a covered water.

### III. Courts Reject the Agencies' 2015 Attempt to Define "Waters of the United States" Based on the Significant Nexus Standard.

67.     On June 29, 2015, EPA and the Corps published in the Federal Register a final rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act." 80 Fed. Reg. 37,053–37,127 (June 29, 2015) ("2015 Rule"). The 2015 Rule was based on an expansive reading of Justice Kennedy's significant nexus standard and asserted categorical jurisdiction over certain features while maintaining a case-by-case approach for other water features. 80 Fed. Reg. at 37,057.

68.     While litigation was pending, the rule was subject to a nationwide stay. *In re EPA*, 803 F.3d 804, 805 (6th Cir. 2015), *order vacated by In re United States Dep't of Def.*, 713 F. App'x 489, 490 (6th Cir. 2018) (lifting stay in light of *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018), which held that any challenges to the 2015 Rule must be filed in federal district courts, not federal courts of appeals. The rule was also preliminarily enjoined in a number of states by two district courts. *See Georgia* v. *Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018); *North Dakota* v. *U.S. E.P.A.*, 127 F. Supp. 3d 1047 (D.N.D. 2015). As a result, the rule never fully went into effect nationwide.

69.     The two federal district courts that reviewed the merits of the 2015 Rule found the rule unlawful and remanded it to the Agencies. *Texas* v. *U.S. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019); *Georgia* v. *Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019).

70.     On October 22, 2019, the Agencies rescinded the 2015 Rule and reinstated the pre-*Rapanos* regulations as informed by the 2008 guidance, also known as the 1986 regulatory

regime or pre-2015 regime. Definition of ''Waters of the United States''—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

## IV. The Agencies Issue Another Rule In 2020, Then Return In 2021 To The Post-*Rapanos* Guidance.

71.     In 2020, the Agencies issued the Navigable Waters Protection Rule ("NWPR"), which was narrower than the 2015 Rule. The Agencies designed the 2020 NWPR to be consistent with both the *Rapanos* plurality's test and Justice Kennedy's test. Navigable Waters Protection Rule, 85 Fed. Reg. 22,250, 22,262 (Apr. 21, 2020).

72.     The NWPR was also challenged in various federal district courts. Before those challenges were decided, the new Administration requested that the rule be remanded so that the Agencies could review and replace it. In response to that request, two courts vacated and remanded the NWPR, without evaluating the merits of the challenges to the rule. *Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949, 957 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164, 1170 (D.N.M. 2021). Neither decision was reviewed on appeal. *But see In re Clean Water Act Rulemaking*, __ F.4th __, No. 21-16958, 2023 WL 2129631 (9th Cir. Feb. 21, 2023) (holding that a court cannot vacate a regulation without first holding it unlawful).

73.     After those decisions, the Agencies halted implementation of the NWPR and resumed interpreting "waters of the United States" according to the 1986 pre-*Rapanos* regulations as informed by the 2008 post-*Rapanos* Guidance. EPA, *Current Implementation of "Waters of the United States*," https://www.epa.gov/wotus/about-waters-united-states#Current (last visited Oct. 18, 2021).

**V.     The Agencies Issue a Proposed Rule Again Attempting To Redefine "Waters of the United States."**

74.     On December 7, 2021, the Agencies published in the Federal Register a proposed rule entitled "Revised Definition of 'Waters of the United States'" ("Proposed Rule"). 86 Fed. Reg. 69,372–69,450 (Dec. 7, 2021).

75.     The Proposed Rule purported to "restore the longstanding, familiar 1986 regulations, with amendments to reflect the Agencies' determination of the statutory limits on the scope of the 'waters of the United States' informed by Supreme Court case law." 86 Fed. Reg. at 69,416. The Proposed Rule then claimed that "[c]ontinuity with the 1986 regulations will minimize confusion and provide regulatory stability for the public, the regulated community, and the agencies, while protecting the nation's waters." *Id.*

76.     But among other things, the Proposed Rule introduced a version of the significant nexus standard that had not been part of the 1986 regulations. The Proposed Rule provided that certain "other waters" would also be jurisdictional if they met the "significant nexus standard," meaning that they "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of a traditional navigable water, interstate water, or the territorial seas." *Id.*

77.     The Agencies proposed to define "significantly affect" to mean "more than speculative or insubstantial effects." *Id.* at 69,449. The Agencies did not seek comment on alternative definitions of this term.

78.     The U.S. Chamber, the Portland Cement Association, and the Georgia Chamber submitted comments on the Proposed Rule on February 7, 2022.

79.     After the Proposed Rule was issued but before the Agencies issued the Final Rule, in January 2022, the Supreme Court granted certiorari in *Sackett v. EPA*, 142 S. Ct. 896 (Jan. 24,

2022), to decide "whether the U.S. Court of Appeals for the 9th Circuit set forth the proper test for determining whether wetlands are 'waters of the United States' under the Clean Water Act, 33 U.S.C. § 1362(7)." *Id.* The Ninth Circuit expressly "appl[ied] Justice Kennedy's 'significant nexus' inquiry to evaluate whether EPA has jurisdiction to regulate the Sacketts' property." *Sackett v. EPA*, 8 F.4th 1075, 1091 (9th Cir. 2021). The case was argued in the Supreme Court on October 3, 2022, as the first case to be heard during the Court's October 2022 Term.

## VI.   The Agencies Finalize An Overbroad And Vague Final Rule Without Waiting for the Supreme Court.

### A.    The Final Rule

80.    Not content to wait for guidance from the Supreme Court, on December 30, 2022, EPA and the Corps released a final rule entitled Revised Definition of "Waters of the United States" ("Final Rule"). The rule was published in the Federal Register on January 18, 2023. 88 Fed. Reg. 3,0004.

81.    As in the Proposed Rule, the Agencies claim that the Final Rule codifies the pre-2015 regulatory regime, and thus, provides certainty and predictability because the standards in the Final Rule are well-known to the Agencies and the regulated public. 88 Fed. Reg. at 3,007. The Agencies claim that for that reason, the Final Rule imposes de minimis costs. *Id.*

82.    In reality, the Final Rule is an expansion from the pre-2015 regulatory regime.  It allows for jurisdiction based on a broad application of the significant nexus standard.  And contrary to the Agencies' proclamation, the Final Rule provides the opposite of certainty and predictability by, among other things, introducing a new multi-function, multi-factor test.

83.    The Final Rule interprets the term "waters of the United States" to include five categories of waters:

- traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");

- impoundments of "waters of the United States" ("paragraph (a)(2) impoundments");

- tributaries to traditional navigable waters, the territorial seas, interstate waters, or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries");

- wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and

- intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters"). 33 CFR 328.3(a)(1)–(5).

84. For the final three categories—tributaries, adjacent wetlands, and other waters—the Final Rule purports to allow for jurisdiction under either the *Rapanos* plurality's relatively permanent water test or a version of Justice Kennedy's significant nexus test.

85. According to the Final Rule, waters meet the relatively permanent test if they are relatively permanent, standing or continuously flowing waters bodies of water or have a continuous surface connection to such a water. 88 Fed. Reg. at 3,066.

86. According to the Final Rule, waters meet the Agencies' version of the significant nexus standard where they "either alone or in combination with similarly situated waters in the region significantly affect the chemical, physical, or biological integrity of" another water. *Id.* Waters are "similarly situated" if they serve common or similar functions.

87. In a significant change from the proposal, the Final Rule defines, for the first time in the long regulatory history recounted above, the term "significantly affect" as "a material influence on the chemical, physical, or biological integrity of [paragraph (a)(1) waters]." 33 C.F.R. § 328.3(c)(6). In order to determine whether this standard is met, the Agencies will assess various functions and consider various factors. *Id.*

- The functions to be assessed are: (1) contribution of flow; (2) trapping, transformation, filtering and transport of material (including nutrients, sediment, and other pollutants); (3) retention and attenuation of floodwaters and runoff; (4) modulation of temperature in paragraph (a)(1) waters; or (5) provision of habitat and food resources for aquatic species located in paragraph (a)(1) waters. *Id.*

- The factors to be considered are: (1) the distance from paragraph (a)(1) waters; (2) hydrologic factors, such as the frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow; (3) the size, density, or number of waters that have been determined to be similarly situated; (4) landscape position and geomorphology; and (5) climatological variables such as temperature, rainfall, and snowpack.

88. The Final Rule sets forth a number of tools and resources that the Agencies will use in making significant effects determinations, including, among other things, "USGS stream gage data, floodplain maps, statistical analyses, hydrologic models and modeling tools such as

USGS's StreamStats or the Corps' Hydrologic Engineering Centers River System Analysis System (HEC-RAS), physical indicators of flow such as the presence and characteristics of a reliable [ordinary high water mark] with a channel defined by bed and banks, or other physical indicators of flow including such characteristics as shelving, wracking, water staining, sediment sorting, and scour." 88 Fed. Reg. at 3,130.

89.     The Final Rule also makes clear that the Agencies do not intend to honor approved jurisdictional determinations ("AJDs") made under the 2020 NWPR.  Instead, the rule incorporates "previous public statements that NWPR AJDs, unlike AJDs issued under other rules that were changed pursuant to notice-and-comment rulemaking rather than vacatur, may not reliably state the presence, absence, or limits of 'waters of the United States' on a parcel and will not be relied upon by the Corps in making new permit decisions."  88 Fed. Reg. at 3,136.

**B.      Contrary to the Agencies' Characterization, the Final Rule Is Not A Codification Of The Pre-2015 Regime.**

90.     The Agencies represent that the purpose of the Final Rule is to codify the pre-2015 regime that has been implemented for many years and to delete the NWPR from the Code of Federal Regulations.

91.     However, the 2019 rule, which codified the pre-2015 regime, came back into effect after the district court decisions vacating the NWPR and the Agencies' decision not to implement it. Accordingly, it would be unnecessary for the Agencies to issue the Final Rule in order to return to the pre-2015 status quo.

92.     In fact, in a significant departure from pre-2015 agency practice, the Final Rule includes all "interstate waters" as paragraph (a)(1) waters regardless of whether those waters are navigable and includes other waters based on a significant nexus to those "interstate waters."

93.     Moreover, the Final Rule codifies a new, expansive view of the significant nexus test into regulatory text that was not part of the pre-2015 regulations or even previewed in the proposal.

94.     The Agencies' characterization of the Final Rule as a ministerial exercise and not a substantive new interpretation is inaccurate and misleading.

95.     Moreover, the Agencies provide no rational explanation for why the Final Rule should be promulgated when the Supreme Court is considering the key question at the heart of the Rule, which implicates the validity of the "significant nexus" test that the Final Rule purports to codify.

**C.     The Final Rule Exceeds The Agencies' Statutory Authority Under The CWA And Congress' Authority Under The Constitution.**

96.     The Final Rule exceeds the Agencies' statutory authority for many reasons.

97.     Among them is that the Final Rule incorporates a version of the significant nexus standard at all.  The Chamber has argued to the Supreme Court that it should hold that the *Rapanos* plurality opinion is the only reading that comports with the text of the CWA. *See* Brief of the Chamber of Commerce of the United States of America, *Sackett v. EPA*, No. 21-454 (Apr. 18, 2022).

98.     Aside from its incompatibility with the text of the CWA, the significant nexus standard must also be rejected as is not authorized by a clear statement from Congress.  *See SWANCC*, 531 U.S. at 172-74 ("Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. … Permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the 'Migratory Bird Rule' would result in a significant impingement of the States' traditional and primary power over land and water use. … We … read the statute as written to avoid the

significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."); *see also West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

99.     The significant nexus standard must be rejected for the additional reason that "longstanding principles of lenity . . . preclude [the] resolution of the ambiguity . . . on the basis of general declarations of policy in the statute and legislative history." *Hughey v. United States*, 495 U.S. 411, 422 (1990). The rule of lenity applies to statutes like the CWA that impose both civil and criminal penalties. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

100.    But even if the significant nexus standard were consistent with the CWA, the Agencies have failed to apply it in a manner that is consistent with Justice Kennedy's opinion.

101.    For example, the Final Rule changes the significant nexus standard from Justice Kennedy's opinion from "significantly affect the chemical, physical, *and* biological integrity" to "chemical, physical, *or* biological integrity," 33 U.S.C. § 328.3(c)(6) (emphasis added), which sweeps in more water features. The Final Rule is inconsistent with Justice Kennedy's opinion because it applies the "significant nexus" standard to not only wetlands, but also tributaries, lakes, ponds, and streams. *Rapanos* 547 U.S. at 780.

102.    The Final Rule also exceeds Justice Kennedy's opinion by allowing the Agencies to find a significant nexus based on the aggregation of vast numbers of "similarly situated" waters because those waters perform similar functions. Justice Kennedy's acknowledgement that "it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region," *id.* at 782, does not authorize gathering up as many wetlands and other waters as possible, because they serve similar functions, to find an aggregate significant nexus.

103. The Final Rule also offers an erroneous version of the *Rapanos* plurality's "relatively permanent" test. Under the pre-2015 regime, the Agencies required year-round flow or water flow "at least seasonally (*e.g.*, typically three months)." 88 Fed. Reg. at 3085. But the Final Rule requires no "specific flow duration" for tributaries, and even tributaries that "may run dry [for] years" may be covered. *Id.*

104. In addition, the Final Rule employs a definition of "adjacency"—for purposes of determining when a wetland is "adjacent" to jurisdictional water and accordingly may qualify as jurisdictional—that provides no practical limit. 88 Fed. Reg. at 3006. A wetland must be "bordering, contiguous, or neighboring," but the Agencies make clear that those terms provide no "bright-line rules." *Id.*

105. Furthermore, the Final Rule exceeds the outer bounds of the authority that Congress invoked under the Constitution. As the Supreme Court said in *SWANCC*, Congress did not invoke the full extent of its authority under the Commerce Clause, but only its traditional jurisdiction over navigable waters. 121 S. Ct. at 172.

106. The Final Rule exceeds that authority by misconstruing the instruction in 33 U.S.C. § 1251(b) to "recognize, preserve, and protect the primary responsibilities and rights of States." The Final Rule views that instruction as preserving only the authority of States to participate in the permitting process to the extent set forth in sections 401, 402, and 404 of the CWA. But that renders 33 U.S.C. § 1251(b) a nullity. Rather, this provision serves to prevent the Agencies from doing what they have done in the Rule—assert regulatory authority over isolated, intrastate waters over which the States have primary regulatory authority.

107. The Final Rule also exceeds the outer bounds of the constitutional authority Congress invoked by reading the word "navigable" out of the statute—namely, by basing

jurisdiction on a connection to non-navigable intrastate water—despite *SWANCC*'s instruction that the word must be given importance in determining the scope of authority Congress invoked. 531 U.S. at 172.

108.    The Final Rule also reaches too far in basing jurisdiction on the "[p]rovision of habitat and food resources for aquatic species," 33 C.F.R. § 328.3(c)(6)(i)(E), similar to the Migratory Bird Rule that the Supreme Court concluded in *SWANCC* exceeded the limits of the authority Congress invoked. *Id.* at 174.

109.    Finally, the Final Rule is unconstitutional in several respects.

110.    The Final Rule impinges on the States' traditional authority protected by the Tenth Amendment to have the primary responsibility for regulation of land and water resources as recognized in section 101(b) of the CWA by sweeping within federal jurisdiction isolated, intrastate waters.

111.    The Final Rule is also impermissible in light of the non-delegation doctrine. If the statute could be read to authorize the broad and unbounded authority that the Agencies claim in the Rule, the statute would fail to provide an intelligible principle to guide the Agencies' decision-making.

**D.    The Final Rule Is Vague And Unworkable Despite The Agencies' Claims To The Contrary.**

112.    The Agencies claim that the Final Rule "increases clarity and implementability." 88 Fed. Reg. at 3,007. But it does not.

113.    Among other things, even assuming that a significant nexus standard is consistent with the Act, relying on case-by-case "significant nexus" determinations for the vast majority of waters will perpetuate confusion in the field.  Given the numerous factors set forth in the Final Rule, and that Final Rule's lack of guidance as to how to apply them, the significant nexus test

will inevitably be applied very differently, and inconsistently, by different agency officials across the country. Moreover, the significant nexus test as articulated in the Final Rule differs from how the Agencies have been implementing the significant nexus standard under the 2008 *Rapanos* Guidance, introducing even further uncertainty and complexity.

114.     The Final Rule's function- and factor-based approach to aggregation of "similarly situated" waters is likewise novel, vague, ambiguous, and not administrable. *See* 33 C.F.R. § 328.3(c)(6). The Final Rule indicates that the Agencies will aggregate waters of the same type (i.e., tributaries with other tributaries), but all tributaries and adjacent wetlands (and potentially other waters) within a catchment area (i.e., the area of the land surface that drains to a specific location for a specific hydrologic feature). To be aggregated, waters do not have to have similar functions, but simply must be located within a catchment area, making the reach of the similarly situated concept extremely broad and difficult for landowners to predict.

115.     The implementation sections of the Final Rule's preamble demonstrate just how difficult it will be for landowners to understand if a non-navigable, intrastate feature is jurisdictional under the Rule. For example, the "interstate" waters category requires a four-step analysis, one of which is the multi-function, multi-factor significant nexus standard. The tributary category requires six steps, including the significant nexus standard. The Agencies claim that the use of various resources and tools, such as "USGS stream gage data, floodplain maps, statistical analyses, hydrologic models and modeling tools" among many others, will address concerns about the complexity and inconsistency of jurisdictional determinations. 88 Fed. Reg. at 3,130. But these tools do nothing to simplify the permit process for applicants who must hire expensive consultants to analyze these resources.

**CLAIMS FOR RELIEF**

**COUNT ONE:**
**Violation of the Clean Water Act**
**And The Administrative Procedure Act**

116.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

117.     All rules must be consistent with their authorizing statutes. 5 U.S.C. § 706(2)(A).

118.     The Clean Water Act authorizes the Agencies to assert jurisdiction over only "navigable waters," defined as "waters of the United States." *See* 33 U.S.C. §§ 1344, 1362(7).

119.     The Final Rule's definition of "waters of the United States" is contrary to the Clean Water Act, and is therefore arbitrary, capricious, and an abuse of the Agencies' discretion.

120.     The Final Rule exceeds the Agencies' statutory authority by, among other things, reading the word "navigable" out of the statute.

121.     It also asserts that waters can be jurisdictional based on a significant nexus without a continuous surface connection to a navigable water, in conflict with the *Rapanos* plurality's correct reading of the statute.

122.     Further, even if the significant nexus standard could be relevant under the CWA, the Final Rule also conflicts with that standard as articulated in Justice Kennedy's opinion. For example, the Final Rule applies the significant nexus standard to waters other than wetlands, including intrastate lakes, ponds, streams, and tributaries. As another example, the Final Rule also allows the Agencies to find a significant nexus based on the aggregation of similarly situated waters in the region because those waters serve similar functions, which is inconsistent with Justice Kennedy's opinion.

123.     The Final Rule also exceeds the Agencies' statutory authority for all the reasons previously explained, including its definition of "relatively permanent," its definition of "adjacent," its misconstruction of 33 U.S.C. § 1251(a) and (b), its inconsistency with *SWANCC*,

and its lack of clear congressional authorization under the major questions doctrine and the rule of lenity.

124.     Because the Final Rule exceeds the Agencies' statutory authority under the CWA, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## COUNT TWO:
### The Final Rule Is Arbitrary And Capricious
### Under The Administrative Procedure Act

125.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.     Rules cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency must provide an internally consistent and satisfactory explanation for its actions. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1371 (11th Cir. 2002); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987). It must treat similar cases similarly or "provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

127.     The Final Rule is arbitrary and capricious, among other reasons, because it:

- fundamentally misrepresents the Final Rule as codifying the pre-2015 regulatory regime when in fact, it codifies a significantly different regime;

- fails to explain its reasons for departing from the pre-2015 regulations; and

- relies on subjective case-by-case tests and thus fails to provide the clarity and consistency that it claims it does.

128.     Each of these aspects of the Final Rule is arbitrary and capricious. The Final Rule

is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).

## COUNT THREE
### Violation Of The Notice and Comment Requirements Of
### The Administrative Procedure Act

129.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

130.     The APA provides that before an agency conducts a "rulemaking," it must

provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity

to participate in the rule-making through submission of written data, views, or arguments." 5

U.S.C. § 553(b)-(c). A reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . without observance of procedure required by law." 5

U.S.C. § 706(2)(D).

131.     If a final rule is not the "logical outgrowth" of the proposed rule, the rule is

invalid for a failure to provide adequate notice and opportunity to comment. *Long Island Care At*

*Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

132.     The Final Rule is not a logical outgrowth of the proposal because the Agencies

changed a fundamental aspect of the proposed rule—the definition of "significantly affect"—

without providing sufficient notice that it might engage in such a change. The proposal defined

"significantly affect" as "more than speculative or insubstantial effects," 86 Fed. Reg. at 69,449,

while the Final Rule defined "significantly affect" as "a material influence," 33 C.F.R.

§ 328.3(c)(6). The Agencies never indicated in the proposal that they were considering changes

to the basic definition of "significantly affect." Because the Agencies did not do so, the public,

including Plaintiffs, were deprived of the opportunity to comment on this important topic.

133.     The Agencies also did not invite comment on whether to honor previously approved jurisdictional determinations, but then determined not to do so by incorporating into the Final Rule "previous public statements."  88 Fed. Reg. at 3,136

## COUNT FOUR:
### The Final Rule Is Impermissible Under The Non-Delegation Doctrine

134.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

135.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

136.     Congress cannot delegate legislative power to executive agencies unless it provides "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

137.     The Final Rule should be set aside because if 33 U.S.C. § 1362(7) authorizes the broad and unbounded authority that the Agencies claim in the Rule, the statute would fail to provide an intelligible principle to guide the Agencies' decision-making.

138.     The delegation of such broad authority would also be unconstitutional because: (1) Congress has not made a policy decision and authorized the agencies to "fill up the details"; (2) Congress has not prescribed a rule governing private conduct and made application of that rule contingent upon executive fact finding; and (3) Congress has not assigned non-legislative responsibilities to the executive and judicial branches. *See, e.g.*, *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting). The decision to assert federal regulatory authority over the use of vast intrastate water resources is a legislative policy choice that Congress cannot delegate to the executive branch.

## COUNT FIVE:
### The Final Rule Renders The Clean Water Act In Excess Of
### Congress' Commerce Clause Authority

139.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

140.     The Constitution grants to Congress the power "to regulate Commerce with foreign Nations, and among the several states." U.S. Const. art. I, § 8.  In the CWA, "[t]he term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *SWANCC*, 531 U.S. at 172.

141.     The Final Rule's assertion of jurisdiction, if adopted as the meaning of the CWA, would exceed the authority that Congress asserted under the Commerce Clause over the channels of interstate commerce as well as the limits of the authority Congress could invoke under the Commerce Clause. The Final Rule exceeds this authority because, among other reasons: (1) the Final Rule reads the word "navigable" out of the statute by basing jurisdiction on a connection to non-navigable interstate waters; and (2) the Final Rule allows jurisdiction over isolated features, 33 C.F.R. § 328.3(c)(6)(i)(E), similar to the overly broad assertions of jurisdiction that the Supreme Court rejected in *SWANCC*.

142.     The Final Rule thus renders the Clean Water Act in excess of Congress' authority under the Commerce Clause. Accordingly, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law." 5 U.S.C. § 706(2)(A).

**COUNT SIX:**
**The Final Rule Violates State Sovereignty**
**Reserved Under the Tenth Amendment**

143.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

144.     Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the State respectively, or the people." U.S. Const. amend. X. By protecting state sovereignty, the Tenth Amendment also protects "the liberty of all persons

within a State by ensuring that laws enacted in excess of delegated government power cannot direct or control their actions." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011).

145. Among the rights and powers reserved to the State under the Tenth Amendment is the authority to regulate intrastate land use and water resources. *SWANCC*, 531 U.S. at 174.

146. The Final Rule violates the States' sovereignty reserved under the Tenth Amendment and the protections built into the CWA in 33 U.S.C. § 1251(b) by:

- reading the word "navigable" out of the statute by basing jurisdiction on a connection to non-navigable interstate waters;

- allowing jurisdiction over isolated features, 33 C.F.R. § 328.3(c)(6)(i)(E), similar to the assertions of jurisdiction that the Supreme Court rejected in *SWANCC*.

147. Accordingly, the Final Rule must be set aside under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

## COUNT SEVEN:
### Violation of the Regulatory Flexibility Act

148. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

149. The Regulatory Flexibility Act ("RFA") requires an agency to conduct a regulatory flexibility analysis whenever that agency is required to publish a general notice of proposed rulemaking for any proposed rule. 5 U.S.C. § 603.

150. During the notice and comment period for this matter, the Chamber submitted comments addressing the Agencies' failure to comply with the requirements of the RFA and requesting that the Agencies comply prior to issuance of the Final Rule.

151. The Agencies violated the RFA by failing to conduct the analyses required based on their improper certification that no regulatory flexibility analysis was needed because the Final Rule "will not have a significant economic impact on a substantial number of small entities under the RFA." 88 Fed. Reg. at 3,139. This conclusion is based on a description of the Final Rule that does not reflect reality. The Final Rule states that "it narrows the scope of jurisdiction from the text of the 1986 regulations," and "[b]ecause fewer waters will be subject to the Clean Water Act under this rule than fall within the scope text of the regulations in effect, this action will not affect small entities to a greater degree than the existing regulations currently in effect." 88 Fed. Reg. at 3,140.

152. As explained above, however, the Final Rule departs significantly from the 1986 regulations by incorporating newly articulated versions of the relatively permanent and significant nexus standards. As a result, small businesses, including ranchers, land developers, and manufacturers, would incur significant costs to comply with the Final Rule. The expansion of jurisdiction would require more companies to obtain permits, and to expend resources to assess whether doing so is necessary or advisable, under section 404 of the CWA. Further, the Final Rule's use of case-by-case determinations under the significant nexus standard increases the cost and time to prepare jurisdictional determinations as small businesses struggle to apply the vague and subjective significant nexus standard.

153. Plaintiffs are entitled to relief under the RFA because many of its members are small entities that are adversely affected by the Final Rule. *See* 5 U.S.C. § 611.

154. Because the Final Rule will impose significant costs on small businesses, the Final Rule should be enjoined from becoming effective until the Agencies conduct a regulatory flexibility analysis in accordance with the RFA. 5 U.S.C. § 611.

## COUNT EIGHT:
## Violation of the Due Process Clause
## of the Fifth Amendment

155.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

156.    The Final Rule does not give fair notice of what conduct is prohibited under the

CWA and grants the regulatory authorities broad enforcement discretion. The Final Rule's

reliance on case-by-case determinations under the vague and subjective significant nexus

standard fails to provide clear notice of what waters are subject to CWA jurisdiction, and

therefore, what conduct is prohibited. It also gives substantial discretion to regulators to

determine what constitutes a significant nexus through a weighing of various factors with

minimal guidance on how those factors are to be weighed.

157.    An approved jurisdictional determination determining that a parcel contains *no*

jurisdictional waters is supposed to grant private parties "a five-year safe harbor" from civil

enforcement by the Agencies.

158.    That safe harbor is critical to ensuring the Act complies with the guarantees of

due process. *Hawkes*, 578 U.S. at 602-03 (Kennedy, J., concurring, joined by Thomas and Alito,

JJ.) ("An approved [JD] gives a landowner at least some measure of predictability, so long as the

agency's declaration can be relied upon.  …  [T]he Court is right to construe a JD as binding in

light of the fact that in many instances it will have a significant bearing on whether the Clean

Water Act comports with due process. The Act, especially without the JD procedure were the

Government permitted to foreclose it, continues to raise troubling questions regarding the

Government's power to cast doubt on the full use and enjoyment of private property throughout

the Nation.").

159. But the Final Rule makes clear that the Agencies do not intend to honor approved jurisdictional determinations under the previous rule, despite the effort and expense involved in obtaining them. *See* 88 Fed. Reg. at 3136.

## PRAYER FOR RELIEF

1. Wherefore, Plaintiffs ask this Court to enter an order and judgment:

A. Declaring that the Final Rule is unlawful because it: (1) was issued in violation of the CWA and the APA; (2) is arbitrary and capricious in violation of the APA; (3) renders the CWA in excess of Congress' constitutional authority; (4) was issued in violation of the notice and comment provisions of the APA; (5) violates state sovereignty reserved under the Tenth Amendment and (6) was issued in violation of the RFA;

B. Vacating and setting aside the Final Rule in its entirety;

C. Issuing permanent injunctive relief prohibiting the Agencies from using, applying, enforcing, or otherwise proceeding on the basis of the Rule;

D. Remanding this case to EPA and the Corps, to permit the Agencies to issue a rule that complies with the CWA, the APA, the RFA, and constitutional principles of federalism and dual sovereignty;

E. Awarding Plaintiffs costs and attorneys' fees pursuant to any applicable statute or authority; and

F. Awarding Plaintiffs such additional relief, including equitable injunctive relief, as the Court deems appropriate.

Dated: February 22, 2023

/s/ *Charles E. English, Jr.*

Charles E. English, Jr. ("Buzz")
Sarah P. Jarboe
LaJuana S. Wilcher
English, Lucas, Priest & Owsley, LLP
1101 College Street; P.O. Box 770
Bowling Green, KY 42102-0770
(270) 781-6500
benglish@elpolaw.com
sjarboe@elpolaw.com
lwilcher@elpolaw.com

Elbert Lin (*pro hac vice pending*)
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com

Matthew Z. Leopold (*pro hac vice pending*)
Kerry L. McGrath (*pro hac vice pending*)
Erica N. Peterson (*pro hac vice pending*)
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
mleopold@HuntonAK.com
kmcgrath@HuntonAK.com
epeterson@HuntonAK.com

*Counsel for Plaintiffs Kentucky Chamber of Commerce, Chamber of Commerce of the United States of America, Associated General Contractors of Kentucky, Inc., Home Builders Association of Kentucky, Portland Cement Association, and Georgia Chamber of Commerce*

Andrew R. Varcoe (*pro hac vice pending*)
Stephanie A. Maloney (*pro hac vice pending*)
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
avarcoe@USChamber.com
smaloney@USChamber.com

*Counsel for Plaintiff Chamber of Commerce of the United States of America*