# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE; | ) |
| CHAMBER OF COMMERCE OF THE | ) |
| UNITED STATES OF AMERICA; | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC.; | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY; | ) |
| PORTLAND CEMENT ASSOCIATION; and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

**DECLARATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

1. Declaration of Baer, Louis
   Portland Cement Association....................................................................... 001 of 058

2. Declaration of Durbin, Martin
   Chamber of Commerce of the United States of America .......................................... 006 of 058

3. Declaration of Heck, Jason
   Alliance Coal ........................................................................................ 013 of 058

4. Declaration of Mitchell, Van
   Logan Aluminum ..................................................................................... 018 of 058

5. Declaration of O'Bryan, Jerry W.
   O'Bryan Land, LLC, Piggy Express, LLC and O'Bryan Grain Farms, Inc. .............. 025 of 058

6.   Declaration of Perry, Daniela
     Georgia Chamber of Commerce ............................................................. 030 of 058

7.   Declaration of Sanford, Anetha
     Home Builders Association of Kentucky ................................................ 037 of 058

8.   Declaration of Stout, Colin
     Innovative Demolition Services, LLC .................................................... 040 of 058

9.   Declaration of Tollison, Trip
     Savannah Economic Development Authority.......................................... 044 of 058

10.  Declaration of Vincent, Richard
     Associated General Contractors of Kentucky, Inc................................... 048 of 058

11.  Declaration of Watts, Ashli
     Kentucky Chamber of Commerce .......................................................... 053 of 058

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL*. | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

## DECLARATION OF LOUIS BAER

I, Louis Baer, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Senior Director & Counsel, Government Affairs of the Portland Cement Association ("PCA"). I manage and oversee PCA's regulatory advocacy and litigation efforts on environment and energy-related issues before federal agencies, including the definition of "waters of the United States" under the Clean Water Act.

3.      My business address is 200 Massachusetts Avenue, NW, Suite 200, Washington, DC 20001.

4.      PCA is the premier trade association representing the majority of portland cement production capacity in the United States and serve nearly every Congressional district. PCA conducts market development, engineering, research, education, technical assistance, and public affairs programs on behalf of its member companies. PCA's mission focuses on improving and expanding the quality and uses of cement and concrete, raising the quality of construction, and contributing to a better environment. The cement and concrete industry contributes over $100 billion to the economy and employs over 600,000 people.

*5.*     On behalf of its members, PCA works to promote the interests of its members through advocacy before Congress and the executive branch. These advocacy efforts involve supporting economically feasible environmental regulations that provide PCA's members with regulatory certainty.

6.     PCA filed multiple comments on previous rules defining "waters of the United States" (WOTUS) under the Clean Water Act. PCA was also involved in litigation in the Federal District Court of Oklahoma challenging the 2015 Clean Water Rule issued by the Obama Administration.

7.     PCA submitted individual comments and joined coalition comments with the National Ready Mix Concrete Association, National Stone, Sand & Gravel Association, and National Asphalt Pavement Association on the Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule").[1] PCA also provided oral testimony at the public hearing on the Rule.

8.     PCA members operate limestone and aggregate quarries, including in Kentucky, mining them for use as raw materials for the manufacture of cement and concrete. These quarries and their related facilities and operations can encounter

---

[1] *Comments of the Portland Cement Association on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022); *Comments of the National Stone, Sand & Gravel Association, National Asphalt Pavement Association, National Ready Made Concrete Association and the Portland Cement Association on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

water features, such as ephemeral streams, ponds,  isolated wetlands, ditches, and sand and gravel pits, and thus, may be regulated as a WOTUS under the Rule. PCA members regularly apply for and obtain permits under section 404 of the Clean Water Act ("CWA") and have to comply with mitigation requirements under the CWA.

9.      Once the Revised WOTUS Definition was announced, PCA reviewed the proposal and engaged with its members to understand its impacts on its members so as to provide meaningful comments to EPA.

10.      Because of the Rule, PCA members will likely need to hire consultants and lawyers, at significant expense, to determine whether a quarry or other water or wetland feature is a "water of the United States" under the Rule. They may also incur the cost of preparing and submitting permit applications where a permit was not required under the previous regulatory regime. Alternatively or in addition, they may need to relocate or change projects or activities either to avoid permitting or in connection with mitigation.

11.      PCA members often expand quarry operations to mine additional limestone or aggregates for the manufacture of cement and concrete and, as a result of the Rule, may avoid expanding operations if subject to a federal permit or increase mitigation requirements under the Rule.

12.     I declare under penalty of perjury that the foregoing is true and

correct.

Executed this 17th day of February 2023.

*Louis Baer*

_____

Louis Baer

5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF MARTIN DURBIN

I, Martin Durbin, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Senior Vice President for Policy for the Chamber of Commerce of the United States of America ("Chamber"), overseeing the U.S. Chamber's Policy Division, as well as the President of the Chamber's Global Energy Institute, where I oversee a portfolio of policy and advocacy issues in the energy and environment space, including on water infrastructure and water policy. In the latter role, I lead the strategic development and implementation of the Chamber's climate, energy, and sustainability policy, highlighting the role of the business community in both strengthening our energy security and accelerating the clean energy transition.

3.      My business address is 1615 H Street, N.W., Washington, D.C. 20062

4.      The Chamber is a non-profit organization created and existing under the laws of the District of Columbia. The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its

2

members in matters before Congress, the Executive Branch, and the courts. The
Chamber brings this action on behalf of its members.

5.    On behalf of its members, the U.S. Chamber promotes reasonable,
effective environmental regulations that promote important sustainability values
while providing businesses with a stable and predictable regulatory regime.  The
U.S. Chamber pursues these efforts through advocacy directed to federal
legislative and regulatory processes, as well as advocacy in litigation and the
public square. The Chamber's Global Energy Institute is designed to unify
policymakers, regulators, business leaders, and the American public behind a
common-sense energy strategy. The Chamber established a Business Task Force
on Water Policy to provide a platform to mobilize members around water issues,
for which regulatory flexibility and certainty have been identified as top priorities.
The Chamber is a longtime member of the Waters Advocacy Coalition, a broad
cross-section of small businesses, farmers, ranchers and job creators that represent
virtually every segment of the American economy.  The coalition supports a
commonsense, legally appropriate definition of "waters of the United States"
("WOTUS") under the Clean Water Act ("CWA") that promotes clean water,
protects jobs, and provides the regulatory certainty and predictability on which the
Chamber's members rely.

3

6.      The Chamber has been involved in advocacy related to the definition of "waters of the United States" under the CWA for many years, including by submitting comments on the 2020 Navigable Waters Protection Rule and by expressing concerns relating to the repeal and replacement of that rule.

7.      The U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers (collectively "the Agencies") published a new rule earlier this year entitled "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case. The Rule introduces new standards and entirely new terms for determining whether water features are "waters of the United States."

8.      On February 7, 2022, the Chamber submitted comments on the proposal that led to the final rule at issue in this case—"Revised Definition of 'Waters of the United States,'" 86 Fed. Reg. 69,372–69,450 (Dec. 7, 2021).[1] The Chamber also joined the comments of the Waters Advocacy Coalition, of which the Chamber is a member.[2] Both comments raised numerous serious legal and

---

[1] *Comments of the Chamber of Commerce of the United States of America on Proposed Rule, Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021),* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[2] *Comments of the Waters Advocacy Coalition (WAC) on the U.S. Environmental Protection Agency's and U.S. Army Corps of Engineers' Proposed Revised Definition of "Waters of the United States,"* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022) (corrected Feb. 9, 2022).

4

policy concerns about the substance of the Proposed Rule, many of which were not addressed by the Agencies and are still applicable to the Rule.

9.    In July 2022, the Chamber also convened a roundtable of more than 100 stakeholders, including state and local governments, environmental non-governmental organizations, and businesses, to enable more participation and provide the Agencies with a summary of key discussion points and suggested next steps as the Agencies moved forward with a WOTUS regulation.

10.    During that roundtable, the Chamber's members and other stakeholders identified challenges in the timing and costs for jurisdictional determinations. During the roundtable, 85.7% of meeting attendees stated that the most significant challenge related to the definition of WOTUS is that it is too vague and confusing. 71.4% said that it is too broad, and that the amount of time it takes to complete the jurisdictional determination and permitting processes presents significant challenges for important projects and business activities.

11.    The Chamber worked with members to identify the impacts of the Rule, especially on small businesses, and called for the Agencies to convene a Small Business Regulatory Enforcement Fairness Act panel. The Agencies did not convene such a panel.

12.    In the Chamber's view, the Agencies did not sufficiently consider the impact of the Rule, particularly on small businesses, including the need for greater

5

certainty and predictability in determining whether waters are subject to CWA jurisdiction.

13.   The Rule applies a new version of the significant nexus standard to a broad new category of "other waters." Members of the Chamber will need to spend resources on consultants or attorneys, and will need to incur other costs (including costs caused by delaying projects and activities), to investigate whether the water or wetland feature is a "water of the United States" under that new standard. They will then need to submit an application for a permit where not previously needed or to relocate or change projects or activities to avoid permitting.  If they proceed with a permit, they will incur the costs related to that application, and for mitigation required to offset the proposed impacts.

14.   The Chamber's members will need to hire consultants and attorneys, and will incur other costs (including delay-related costs), to determine whether a water or wetland feature is a "water of the United States" under the Rule's new standards. If the water or wetland feature is a "water of the United States," the member will incur additional permitting and/or mitigation costs.

15.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _17_ day of February 2023.

Martin Durbin

7

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL*. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF JASON HECK

I, Jason Heck, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Manager of Environmental Compliance for Alliance Coal, LLC ("Alliance").  My business address is 1146 Monarch Street, Suite 350, Lexington, Kentucky 40513.

3.      I am offering this declaration in support of the Plaintiffs in the above-captioned case.

4.      In the operation of its business, Alliance provides certain support services to various wholly-owned, independent operating subsidiaries engaged in the mining, preparation, and processing of coal.

5.      Among Alliance's independent operating subsidiaries engaged in the mining of coal in Kentucky are: River View Coal, LLC ("River View"), Warrior Coal, LLC ("Warrior"), and MC Mining, LLC ("MC Mining").

6.      Alliance is a member of the Kentucky Chamber of Commerce.

7.      I have a Bachelor's Degree from the University of Kentucky and have worked with Alliance since January 2009.  I provide support and oversight associated with Clean Water Act ("CWA"), National Pollutant Discharge Elimination System ("NPDES"), 401 and 404, Clean Air Act ("CAA"), Minor

2

Source Operating Permits ("MSOP"), Federally Enforceable State Operating Permits ("FESOP"), state water withdrawal, Environmental Protection Agency ("EPA") underground injection, and other permitting programs. I have organized and performed Phase 1 and Phase 2 environmental assessment audits. I oversee third-party water sampling laboratory testing and reporting to operating companies. I have worked on WOTUS related regulations and compliance for Alliance and/or its independent operating subsidiaries since the fourth quarter of 2019.

8.      Alliance and its independent operating subsidiaries have worked in collaboration with the United States Army Corps of Engineers ("COE") on Nationwide and Individual Permit Projects since 1999. Such work has involved interaction with the Louisville, Huntington, and Pittsburgh Districts of the COE and included, without limitation, Nationwide 3, 9, 14, 19, 21, 44, 49 and 50 Permit Programs.

9.      I am aware of the Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case.

10.     Of Alliance's and its independent operating subsidiaries' current projects with the COE, at least three projects ("Permit Projects") are likely to be impacted by the Rule.

3

11.     Alliance is presently working with the COE on one Nationwide 14 permit project, involving the construction of a road for the transport of materials and supplies.

12.     Alliance is presently working with the COE on two individual permits that involve the removal of topsoil and the construction of mine refuse impoundments.

13.     All three of the aforementioned COE Permit Projects involve ephemeral and/or intermittent streams and/or small, isolated wetlands.

14.     The Permit Projects are all located in previously farmed fields or upland wooded areas.

15.     The Permit Projects all involve streams of poor quality as a result of prior farming activity.

16.     The Permit Projects have required Alliance and its independent operating subsidiaries to expend considerable time and resources in the engagement of private consultants.  Based in part upon the changing and inconsistent definitions provided by the Rule, Alliance and its independent operating subsidiaries have had to withdraw and resubmit permit applications, causing significant project delays.

17.     With respect to one of the individual permit projects, purchases of land occurred.  As a result of the changes to the WOTUS definition in the Rule and

4

likely increases in the scope of jurisdictional waters on the land that was

purchased, COE "in-lieu fees," fees paid to a governmental or non-profit entity to

satisfy compensatory mitigation requirements, associated with the individual

permit project are anticipated to rise by greater than 75%. This increase in fees

could impact the company's decision-making going forward with the project or

render earlier decisions considerably more expensive than anticipated.

18.     At minimum, Alliance or its independent operating subsidiaries will

have to spend time and money to determine the extent of federal jurisdiction over

its existing Permit Projects under the new Rule.

19.     In addition to the Permit Projects referenced in this declaration, the

Rule reasonably can be anticipated to impact mining operations of Alliance's

independent operating subsidiaries.  Such impact could include increased

permitting, compliance, or remediation costs associated with the alleged

subsidence of waters of the United States, as set forth under the Rule.

20.     I declare under penalty of perjury that the foregoing is true and

correct.

Executed this 21 day of February 2023.

Jason Heck

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

KENTUCKY CHAMBER OF COMMERCE, ET AL.,　　)
UNITED STATES CHAMBER OF COMMERCE,　　　 )
ASSOCIATED GENERAL CONTRACTORS OF　　　　)
KENTUCKY, INC.,　　　　　　　　　　　　　　)
HOME BUILDERS ASSOCIATION OF KENTUCKY,　 )
PORTLAND CEMENT ASSOCIATION, and　　　　　 )
GEORGIA CHAMBER OF COMMERCE,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　)
UNITED STATES ENVIRONMENTAL PROTECTION　)
AGENCY, *ET AL*.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　Defendants.　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)

# DECLARATION OF VAN MITCHELL

I, Van Mitchell, declare based on personal knowledge as follows:

1.     I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.     I am the Environmental, Safety & Security Manager at Logan Aluminum, Inc.. My business address is 6920 Lewisburg Rd., Russellville, KY 42276.

3.     I am offering this declaration in support of Plaintiffs in the above-captioned case.

4.     I began my career at Logan in 1994 in Operations. I have held several roles in my tenure at Logan with direct responsibility for Environmental, Safety, and Security. Currently, and since 2019, I have been Logan's Manager of Environmental, Safety, and Security with responsibility for compliance with all applicable environmental regulatory requirements, including the Clean Water Act and regulations relating to the "waters of the United States". In that role, I have had responsibility not only for permitting compliance, but also for evaluating plant construction that would potentially involve expanded costs for consulting, permitting, and mitigation activities due to plant expansion. Prior to my current position, I had primary operational responsibility as the Business Unit Manager of Logan's Remelt Unit. In that role, I worked closely with Logan's environmental

2

professionals to ensure compliance with all regulatory requirements, including all applicable environmental standards.

5.     Logan Aluminum, Inc. is the largest integrated can sheet manufacturing facility in North America. Logan Aluminum produces over 2 billion pounds of aluminum annually and employs over 1,500 people. In addition to Logan's own employees, approximately 250 contractor employees work permanently at the Logan plant site.

6.     Logan Aluminum is a member of the U.S. Chamber of Commerce and the Kentucky Chamber of Commerce.

7.     Logan Aluminum is located on a 1,000-acre site in western Kentucky. The property contains ephemeral, intermittent, and perennial streams as well as natural ponds and wetlands. Due to the location of the property, many of these water features are fed by groundwater.

8.     Logan Aluminum has had a multi-year history with the definition of "waters of the United States" under the Clean Water Act dating back to 2014 when Logan began planning an expansion project. Since that time, the company has completed work under three nationwide permits, received two jurisdictional determinations, and hired consultants to complete two surveys of its property to determine the presence of "waters of the United States" on its property. Some of the water features on Logan's property are jurisdictional and their status would not

3

change under the new Rule.  Other features, however, including ephemeral streams and isolated wetlands have not previously been jurisdictional.  The status of these other water features will be unclear to Logan should the new Rule become effective.

9.    In 2014, Logan hired consultants to conduct a survey of most of its property and obtained from the U.S. Army Corps of Engineers (Corps) a jurisdictional determination regarding the presence of "waters of the United States" on the property. In addition to our internal management and staff time, Logan spent $30,000 on external consultants to conduct the survey and interface with the Corps to obtain the jurisdictional determination.

10.    A later expansion included construction of a metal storage pad. In order to avoid impacts to a perennial stream that would have required a lengthier individual permit process and cost the company approximately $200,000 in consulting fees and mitigation costs, Logan modified its construction plans. The result is that to avoid such excessive costs, the modified plan developed 300 linear feet of the 426-foot perennial stream which resulted in less than an optimal solution for the Company.

11.    In 2022, Logan conducted a second delineation survey that included the entire property as part of the process for renewing the jurisdictional

021 of 058

determination. The jurisdictional determination was renewed for another five years.

12.    Logan estimates that over the past eight years, it has spent over $100,000 on consultants and permitting fees to assess the jurisdictional status of its property and apply for Nationwide permits. In addition, Logan's own employees have spent a significant amount of time on this question.

13.    I am aware of the Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case. The Rule introduces new standards and definitions for determining whether water features are "waters of the United States." The Rule's significant nexus standard specifically contemplates asserting jurisdiction based on a subsurface hydrologic connection, which is particularly problematic given that much of Logan's property is fed by groundwater. Having experienced the need to modify its desired construction plans in the past due to permit and jurisdictional concerns, Logan is concerned that further expansion of the jurisdictional scope to include Logan's ephemeral streams and isolated wetlands would add unnecessary costs and delays to future expansion plans and uncertainty to its planning process. Additional costs for consulting assistance also would be required. Perhaps the most significant effect would be the uncertainty of what is required above existing requirements and how to modify projects to ensure compliance.

14.   Logan has already spent significant staff time trying to understand the various new standards and terms introduced by the Rule.

15.   Logan is in the process of planning an infrastructure improvement project for which it will incur additional expenses to ensure compliance with the Rule. Logan's facility currently has hundreds of trucks driving in and out of the facility on a daily basis. In order to move material in and out of the property in a more environmentally sustainable way, Logan is planning to expand its rail infrastructure which would have the beneficial effect of taking hundreds of trucks off the road on a daily basis.

16.   The rail project will likely require crossing a perennial stream as well as moving a storm water retention pond. The project may also affect some ephemeral streams or isolated wetlands on the property.

17.   Logan Aluminum will have to hire consultants to review how the Rule will affect our permit requirements and how it will affect our project design and execution.  With the uncertainty of the definitions of the "waters of the United States" Logan will have to expend yet additional time and resources to assess whether its project design will fit within acreage thresholds to qualify for an existing nationwide permit, whether it will need to seek an individual permit, and what mitigation may be required.

6

023 of 058

18.    Another project that Logan is considering in the near future is to connect two parking lots on its property. That project could also involve impacts to streams on the property, meaning that Logan will need to hire consultants to determine what project changes, permitting, or mitigation may be required under the new Rule.

19.    If the Rule were set aside, Logan would not have to hire consultants for assistance to determine if its expansion and construction activities would affect waters that are newly jurisdictional under the Rule. It would also avoid the possibility of mitigation and permitting expenses that would result if any waters on its property were deemed newly jurisdictional because of the Rule.

20.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20 day of February 2023.


Van Mitchell

7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

KENTUCKY CHAMBER OF COMMERCE,

CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA,

ASSOCIATED GENERAL CONTRACTORS OF KENTUCKY, INC.,

HOME BUILDERS ASSOCIATION OF KENTUCKY,

PORTLAND CEMENT ASSOCIATION, and

GEORGIA CHAMBER OF COMMERCE,

        Plaintiffs,

       v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

MICHAEL S. REGAN, in his official
capacity as Administrator of the United
States Environmental Protection Agency,

UNITED STATES ARMY CORPS OF
ENGINEERS, and

MICHAEL CONNOR, in his official
capacity as Assistant Secretary of the
Army (Civil Works),

        Defendants.

---

## DECLARATION OF JERRY W. O'BRYAN

---

I, Jerry W. O'Bryan, declare based on personal knowledge as follows:

1.     I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.     I am the single member of O'Bryan Land, LLC and Piggy Express, LLC, 6939 Curdsville-Delaware Road, Owensboro, Kentucky 42301. I am also the President and majority shareholder of O'Bryan Grain Farms, Inc., 10124 Boone Street, Owensboro, Kentucky 42301.

3.     I am offering this declaration in support of Plaintiffs in the above-captioned case.

4.     O'Bryan Land, LLC, Piggy Express, LLC and O'Bryan Grain Farms, Inc. are members of the Kentucky Chamber of Commerce and the Chamber of Commerce of the United States of America.

5.     O'Bryan Land, LLC, Piggy Express, LLC, and O'Bryan Grain Farms, Inc. own and operate approximately 1,800 acres of land in Davies County, Kentucky (collectively, "my farms").

6.     We operate a 10,000 sow, farrow-to-finish operation and grow row crops that are used for feed for the pigs on my farms. We are the largest pork producer in Kentucky.

2

**026 of 058**

7.     Through my farms or individually, I have farmed in Davies County, Kentucky since 1976.

8.     Ephemeral streams, ditches, wetlands, and other water features are located on my farms.

9.     When conducting my farming operations, we have been required to hire consultants to conduct jurisdictional determinations.

10.    The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency have from time to time asserted that certain farming activities on my farms have been conducted in jurisdictional "waters of the United States."

11.    The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency have required me to obtain permits, pay fines, and perform remedial work on my farms as a result of my farming activities.

12.    The Commonwealth of Kentucky requires Kentucky Pollutant Discharge Elimination System ("KPDES") permits for discharges and has asserted that there are discharges to ditches on my farms that are subject to KPDES permit requirements.

13.    The Commonwealth of Kentucky has issued a notice of violation, claiming that irrigation water that purportedly entered a ditch on my farms is an unlawful discharge that requires a KPDES permit.

14.    We have been required to hire attorneys to defend and advise us concerning the jurisdictional definition of "waters of the United States."

15.    I am aware of the Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case. The Rule introduces new standards and entirely new terms for determining whether water features are "waters of the United States."

16.    O'Bryan Grain Farms, Inc., O'Bryan Land, LLC, and Piggy Express, LLC will have to hire consultants and attorneys to determine whether current and future farming activities, involving currently disputed water features and water features not previously considered jurisdictional, will be affected by the new standards introduced by the Rule. And if those features are now jurisdictional, we will have to expend yet additional time and resources to assess whether our farming operations should be changed, whether a permit is required, and if so, what type of permit will be necessary.

17.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of February 2023.

**O'BRYAN GRAIN FARMS, INC.**

Jerry W. O'Bryan, President & Major
Shareholder

4

**O'BRYAN LAND, LLC**

Jerry W. O'Bryan, Single Member

**PIGGY EXPRESS, LLC**

Jerry W. O'Bryan, Single Member

5

**029 of 058**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL*. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF DANIELA PERRY

I, Daniela Perry, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am Vice-President at the Georgia Chamber Foundation. The Georgia Chamber Foundation is part of the Georgia Chamber of Commerce and serves as the policy and research arm of the Georgia Chamber.

3.      My business address is 270 Peachtree St., NW, Suite 2200, Atlanta, GA 30303.

4.      The Georgia Chamber of Commerce serves the unified interests of its nearly  50,000 members – ranging in size from small businesses to Fortune 500 corporations – covering a diverse range of industries across all of Georgia's 159 counties. The Georgia Chamber is the State's largest business advocacy organization and is dedicated to representing the interests of both businesses and citizens in the State. Established in 1915, the Georgia Chamber's primary mission is creating, keeping and growing jobs in Georgia. The Georgia Chamber pursues this mission, in part, by aggressively advocating the businesses and industry viewpoint in the shaping of law and public policy in an effort to ensure that Georgia is economically competitive nationwide and in the global economy.

**031 of 058**

5.      I have worked for the Georgia Chamber of Commerce since November 2017. I have served in a variety of roles at the Georgia Chamber, but in my current role I lead the strategic efforts of the Georgia Chamber Foundation including external grant projects, policy initiatives, and producing research and data analysis to support these activities. This work includes the efforts of the Chamber's Energy and Natural Resources Policy Committee which has engaged in rulemakings regarding the definition of "waters of the United States" under the Clean Water Act over the years due to its impact on Georgia Chamber members.

6.      On behalf of its members, the Georgia Chamber supports community and business endeavors that utilize Georgia's natural resources in a way that sustain, enhance, protect and conserve these natural resources for present and future generations, while at the same time recognizing the importance of promoting the development of commerce and industry that utilize sustainable business management practices. In the area of water policy, the Georgia Chamber works to promote the stable, reasonable and predictable implementation of existing laws and regulations and the development of additional rules and regulations which further the dual goal of environmental and economic sustainability. The Georgia Chamber achieves this goal in part through its various policy committees, in particular the Energy and Natural Resources Policy Committee where developments and trends in the area of environmental regulation are closely

3

followed and information provided to members and the leadership and other committees and councils within the Georgia Chamber organization for action. Moreover, the Georgia Chamber utilizes its Law and Judiciary Committee to participate in the litigation process where necessary in cases which may impact its members' stated interests in the sensible implementation or interpretation of existing environmental regulations. The Georgia Chamber also works through its Government Affairs Council, composed of over 400 government affairs professionals from members across the state to achieve the policy objectives of the Chamber, including those related to balanced and sensible environmental regulation.

7.      The Georgia Chamber's Energy and Natural Resources Policy Committee has spent significant resources over the past decade following the various iterations of rules seeking to define the "waters of the United States" for jurisdictional purposes under the Clean Water Act. These Committee actions are predicated on the importance of WOTUS issues to the State's agricultural sector, land and property developers, mining industry, construction industries, regions, counties, and cities. These activities have included:

     i.      Preparing submissions to EPA on Clean Water Act Guidance and all Waters of the United States rulemaking actions undertaken since 2014. This includes written submissions in 2014, 2017, 2019, 2021 and 2022.

4

ii.      Participation in 2019 and 2020 industry meetings with EPA Administrator Andrew Wheeler facilitated by Georgia Farm Bureau;

iii.     Meeting with EPA's Region 4 leadership in 2019 and 2022 to address, amongst other regulatory issues, EPA's WOTUS rulemaking actions;

iv.     Undertaking regular meetings with Georgia's Environmental Protection Division to discuss the benefits and implications of EPA's WOTUS rulemaking actions on the State's water resource management policies, programs and regulatory actions; and

v.      Participation, through review of, input into and support of the U.S. Chamber of Commerce's actions on EPA's CWA and WOTUS regulatory and rulemaking actions.

8.      Both the Energy and Natural Resources and Law and Judiciary Committees have expended time and resources to analyze the proposed rule and its anticipated impacts and to take input from and provide input to its members relative to the proposed rule.

9.      The breadth of the Georgia Chamber's membership guarantees that many of its members are actively engaged in activities, which will be impacted by the Final Rule published by the Agencies in January 2023—Final Rule: Revised Definition of "Waters of the United States," 88 Fed. Reg. 3,004 (Jan. 18, 2023) ("Rule"). The Georgia Chamber represents companies involved in building infrastructure, developing properties, farming, moving dirt and otherwise engaging in activities subject to this rule. The Georgia Chamber has a large manufacturing sector as part of its membership as well as a substantial agriculture and forestry sector, transportation sector, and construction sector. Additionally, the Georgia

Chamber has a number of utility companies as members that engage in disposal activities across the state.

10.     Because of the rule, member companies of the Georgia Chamber will be required to hire environmental consultants at a minimum to help them determine what water bodies are jurisdictional under the new rule. They may also have to consult with environmental attorneys. Moreover, it appears that in several cases these members may have to incur additional expense of reconfiguring projects to avoid newly jurisdictional areas or filing an application for a 404 permit from the United States Corps of Engineers where one may have not been required before.  Even if some level of 404 permitting was already required under the previous regime for the projects that the Georgia Chamber members are engaged in, it is likely that the amount of mitigation and costs of that mitigation for impacts to waters of the United States will increase because of the rule. Thus, members of the Georgia Chamber are facing increased environmental planning and mitigation costs at a minimum, but also may have to consider altering plans and the layout of projects on the ground to try to limit those additional costs.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this __17__ day of February 2023.

Daniela Perry

7

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL*. | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

**<u>DECLARATION OF ANETHA SANFORD</u>**

I,      Anetha Sanford, declare and state under penalty of perjury as follows:

1.      I am a resident of Lexington, KY, over 18 years of age, have personal knowledge of the matters contained herein, and I am competent to testify thereto.

2.      I am the Chief Executive Officer of the Home Builders Association of Kentucky ("HBAK").  I have worked as the CEO for HBAK for over 3 years, and I am familiar with the mission and goals of HBAK in the administrative, legislative and judicial areas.  I am also familiar with the challenges that HBAK's members must overcome to develop land and build homes.

3.      The Home Builders Association of Kentucky (HBAK) is a statewide voluntary trade organization comprised of 4,000 member companies in the housing and construction industry representing well over 30,000 employees across the Commonwealth.  About one-third

are home builders and remodelers.  The rest work in closely related specialties such as sales and marketing, housing finance, and manufacturing and supplying building materials.

4.      The HBAK is made up of 18 local Home Builders Chapters stretching east to west from Pikeville to Paducah and north to south from Northern Kentucky to Somerset. Formed in 1957, the Home Builders Association of Kentucky was established to provide a voice for the housing and residential construction industry in Kentucky's legislative and regulatory environment.

5.      HBAK is a member of the National Association of Home Builders.  Founded in 1942, NAHB is a federation of more than 700 state and local associations.    As a member of NAHB, HBAK relies on NAHB to submit comments on federal rulemakings such as Revised Definition of "Waters of the United States," 88 Fed. Reg. 3,004 (Jan. 18, 2023) ("Rule").  NAHB submitted comments on the Rule and has participated in all rulemakings that impact the definition of the CWA term "waters of the United States" (WOTUS) since the 1980s.

6.      On June 6, 2019, NAHB reaffirmed a policy to urge the EPA and Corps "to adopt regulations, guidance and policies asserting that 'navigability' is the guiding factor to determine the geographic reach of the Clean Water Act (CWA), consistent with congressional intent." The policy also provides that NAHB will urge Congress "to support legislative efforts maintaining that the statutory intent of the CWA is for 'navigability' to be the guiding factor in jurisdictional decisions." To advance this policy, NAHB has been actively involved with many of the issues that relate to CWA navigability at all levels of government.

7.      Many construction activities involve grading, clearing, excavation or other earth moving actions and must comply with CWA Section 402 due to additions of storm water to a WOTUS.  In Kentucky, these members comply with the CWA by obtaining a Kentucky Pollutant Discharge Elimination System (KPDES)  permit issued by the state.  These members generally operate under "KYR10 - Stormwater Construction" which is sometimes referred to as the Kentucky Construction General Permit.  Therefore, these members have been and continue to be regulated under the CWA.

8.     In addition, HBAK members sometimes must place fill material into WOTUS features to create a subdivision or even to make a lot useable.  These members must obtain CWA Section 404 permits which are generally provided by the U.S. Army Corps of Engineers.  To obtain a Section 404 permit, the Corps will often require members to alter their plans to minimize impacts to WOTUS.  In addition, members will have to provide mitigation for any permitted impacts to WOTUS features.

9.     Under the Rule, more geographic features will fall under the jurisdiction of the CWA (and thus the Corps and EPA) than under the Navigable Waters Protection Rule or the 2008 non-binding Guidance.[1]   Therefore, more HBAK members will need to obtain CWA section 404 and 402 permits.  Thus, HBAK members are directly regulated by the Rule.

10.    As the CEO of the HBAK, I often hear from my members concerning problems they are having under the Clean Water Act.

11.    Due to the enormous impacts that the Section 402 and Section 404 programs have on land development activities and, therefore, on the housing industry generally, HBAK is particularly concerned with all federal government decisions that affect how those programs are administered and applied to its Kentucky members.

12.    I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON February 20, 2023.

_Anetha Sanford_
_____
Anetha Sanford

---

[1] Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States*, *Available at* https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos 120208.pdf.

3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL.,<br>UNITED STATES CHAMBER OF COMMERCE,<br>ASSOCIATED GENERAL CONTRACTORS OF<br>KENTUCKY, INC.,<br>HOME BUILDERS ASSOCIATION OF KENTUCKY,<br>PORTLAND CEMENT ASSOCIATION, and<br>GEORGIA CHAMBER OF COMMERCE,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION<br>AGENCY, *ET AL*.<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# DECLARATION OF COLIN STOUT

I, Colin Stout, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Owner and Managing Member of Innovative Demolition Services, LLC ("Innovative Demolition").

3.      My business address is 649 Bizzell Drive, Lexington, KY 40510.

4.      Innovative Demolition is a member of the Associated General Contractors of Kentucky.

5.      Innovative Demolition specializes in bridge demolition. Innovative Demolition Services serves as a subcontractor for general contractors that bid on public-works contracts.

6.      The bridge-demolition projects can range in value from tens of thousands to more than a hundred thousand dollars.

7.      The U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers (collectively "the Agencies") published a new rule earlier this year entitled "Waters of the United States," 88 Fed. Reg. 3,004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case. The Rule introduces new standards and entirely new terms for determining whether water features are "waters of the United States."

2

8.      Innovative Demolition has more than twenty bridges currently under contract for demolition.

9.      The Rule could affect these projects for which Innovative Demolition has contracts. When Innovative Demolition submits a bid to a general contractor, it does so based on specific means and methods designed around predetermined parameters. Those parameters include limitations dictated by approved Clean Water permits or pending permit applications. By introducing new tests for jurisdictional waters, the Rule will likely trigger additional analysis that may sweep in water features not previously deemed subject to federal jurisdiction and may alter the parameters on which Innovative Demolition's bids were based.

10.     The uncertainty caused by the application of the Rule's new standards could cause delays in projects as consultants or regulators determine whether any water features affected by the project are newly considered "waters of the United States" or whether changes are otherwise necessary. The delay alone may cost money and other expense as the company may need to make unanticipated scheduling adjustments. And if a project's parameters change, the complexity and the costs of the project will increase, as the means and methods for the bridge demolition will likely need to change. This could even lead to projects becoming unprofitable or not going forward at all.

3

11.     The new tests under the Rule also make it more difficult to bid on pending projects, as it is unclear whether the parameters affected by permitting for those projects will change.

12.     Innovation Demolition has experienced situations where regulators have required changes midway through a project and is concerned that the Rule could cause similar disruptions to some of its projects currently under contract.

13.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this _17_ day of February 2023.

Colin Stout

4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

# DECLARATION OF TRIP TOLLISON

I, Hugh K. "Trip" Tollison, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the President and CEO of the Savannah Economic Development Authority. My business address is 906 Drayton St., Savannah, GA 31401.

3.      I am offering this declaration in support of Plaintiffs in the above-captioned case.

4.      I previously served as Chief Operating Officer and Vice President of the Savannah Area Chamber of Commerce.

5.      The Savannah Economic Development Authority ("SEDA") is a development authority created under the Constitution of the State of Georgia and is tasked with helping to create, grow, and attract new job opportunities and investment in Chatham County and the Savannah region. The Savannah Economic Development Authority is unique among Georgia development authorities because it is a large landowner in Chatham County, Georgia.

6.      SEDA is a member of the Georgia Chamber of Commerce.

7.      As a large landowner, SEDA has significant experience seeking Clean Water Act ("CWA") jurisdictional determinations and section 404 permits.

8.      I am aware of the Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule") that is the subject of the above-referenced case. The Rule introduces new standards and entirely new terms for determining whether water features are "waters of the United States."

9.      SEDA will have to invest significant time and money to determine whether and to what extent water features and wetlands on its property will be subject to federal jurisdiction under the Rule's new tests.  The costs of redrawing construction plans and alternative site designs can be exceedingly costly for SEDA and the new Rule may jeopardize the feasibility of certain real estate holdings of SEDA for economic development.

10.     Because the Rule sweeps in additional waters and wetlands under the definition of "waters of the United States," it will increase the mitigation costs that SEDA must pay when it seeks CWA permitting to develop property. These costs increase exponentially in the Savannah area where mitigation bank credits for wetlands are more expensive than other areas in the country, costing approximately $80,000 to $100,000 for each credit with six to eight credits needed per acre. As a result of these costs, some properties SEDA has purchased and planned for development may no longer be viable development projects.

11.     One example is a 266-acre industrial real estate property that is currently being marketed by SEDA for a corporate headquarters or other

3

significant business operation that could bring hundreds of jobs to the Savannah region.  Over the last 25 years, the federal-jurisdictional wetlands acreage has changed several times for the property.  The CWA wetland acreage began at 8.82 acres in 1996, and then significantly rose to 51.73 acres in 2016.  In 2021, after the application of the "waters of the United States" rule—the Navigable Waters Protection Rule (the "NWPR"), the wetland acreage fell to 24.58 acres.

12.     Because the Agencies have indicated that approved jurisdictional determinations issued pursuant to the NWPR may not be relied upon in making new permit decisions, SEDA will have to obtain a new approved jurisdictional determination to obtain a CWA permit to develop the property. Under the new Rule, a jurisdictional determination will likely classify even more of the property as jurisdictional wetlands.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of February 2023.

_____

Hugh K. "Trip" Tollison

4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

KENTUCKY CHAMBER OF COMMERCE, ET AL.,       )
UNITED STATES CHAMBER OF COMMERCE,          )
ASSOCIATED GENERAL CONTRACTORS OF           )
KENTUCKY, INC.,                             )
HOME BUILDERS ASSOCIATION OF KENTUCKY,      )
PORTLAND CEMENT ASSOCIATION, and            )
GEORGIA CHAMBER OF COMMERCE,                )
                                            )
                    Plaintiffs,             )
                                            )
v.                                          )
                                            )
UNITED STATES ENVIRONMENTAL PROTECTION      )
AGENCY, *ET AL*.                            )
                                            )
                    Defendants.             )
                                            )

## DECLARATION OF RICHARD VINCENT

I, Richard Vincent, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Executive Vice President of Associated General Contractors of Kentucky, Inc.

3.      My business address is 120 West State Street, Frankfort, KY 40601.

4.      The Associated General Contractors of Kentucky, Inc. ("AGC of Kentucky"), is a non-profit organization created and existing under the laws of the Commonwealth of Kentucky. The AGC of Kentucky is the Commonwealth's leading commercial construction association, representing a membership of over 500 construction contractors, suppliers, and service providers. Our members are engaged in the construction of Kentucky's commercial buildings, shopping centers, manufacturing facilities, hospitals, warehouses, airports, bridges, waste treatment facilities, dams, and multi-family housing projects. AGC of Kentucky is a Kentucky chapter of the Associated General Contractors ("AGC").

5.      As the Executive Vice President for the AGC of Kentucky, I am responsible for AGC of Kentucky's operations and execution of objectives established by AGC of Kentucky's Board of Directors. I have served as the

2

Executive Vice President for 16 years and previously served as Director of Governmental Affairs.

6.      AGC of Kentucky serves as a voice for construction in Kentucky and advocates on behalf of its members before the courts, the legislature, and the executive branch, including on environmental regulations issues.

7.      The AGC has long been engaged in the EPA and the Corps (collectively, the "Agencies") efforts to define "waters of the United States" under the Clean Water Act ("CWA"), including submitting written comments on the Agencies' most recent proposals in 2019 and 2021.[1]

8.      The definition of "waters of the United States," which determines the scope of federal control and CWA permitting requirements, is of fundamental importance to AGC of Kentucky's members. AGC of Kentucky's members perform many construction activities on land and water that often require a jurisdictional determination from the Corps and, in many cases, a Clean Water Act

---

[1] AGC of America, Response to Proposed Revisions to the Definition of Waters of the United States, (April 15, 2019); Docket ID No. EPA-HQ-OW-2018-0149 online at: https://www.regulations.gov/comment/EPA-HQ-OW-2018-0149-6859; the Waters Advocacy Coalition comments (April 15, 2019) on the same online at: https://www.regulations.gov/comment/EPA-HQ-OW-2018-0149-6849; and Federal StormWater Association comments (April 15, 2019) online at: https://www.regulations.gov/comment/EPA-HQ-OW-2018-0149-6877; AGC of America, Response to Proposed Revisions to the Definition of Waters of the United States, 86 Federal Register, 69,372 (Dec. 7, 2021); Docket ID No. EPA-HQ-OW-2021-0002 online at: https://www.regulations.gov/comment/EPA-HQ-OW-2021-0602-0820; the Waters Advocacy Coalition comments (February 7, 2022) on the same online at: https://www.regulations.gov/comment/EPA-HQ-OW-2021-0602-0268; and Federal StormWater Association comments (February 7, 2022) online at: https://www.regulations.gov/comment/EPA-HQ-OW-2021-0602-0613.

050 of 058

404 permit before proceeding because they involve discharge of dredged or fill material into "waters of the United States."

9.     I am aware of the Final Rule published by the Agencies in January 2023—Final Rule: Revised Definition of "Waters of the United States," 88 Fed. Reg. 3,004 (Jan. 18, 2023) ("Rule"). The Rule introduces new standards for determining federal jurisdiction for purposes of the CWA.

10.    AGC of Kentucky's members currently have projects and activities either in progress or in the planning stages that will be affected by the Rule. Members will have to hire consultants and attorneys to determine whether waters or wetland features on their property are subject to CWA jurisdiction under the Rule. This is an expensive and time-consuming process.

11.    If the AGC of Kentucky's members do have jurisdictional waters or wetland features on their property, they will incur additional expenses assessing whether a permit is needed and, in many cases, evaluating  whether to relocate or change the project or activities to avoid jurisdictional areas that require permitting. If they do proceed with a project that requires a CWA 404 permit, members will incur the costs associated with preparation of that application and navigating the lengthy permit process, as well as costs to provide mitigation to offset the proposed impacts. The permitting process can take years and cost tens or hundreds of thousands of dollars.

4

12. I declare under penalty of perjury that the foregoing is true and
correct.

Executed this 16th day of February 2023.

Richard Vincent

5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE, ET AL., | ) |
| UNITED STATES CHAMBER OF COMMERCE, | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC., | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY, | ) |
| PORTLAND CEMENT ASSOCIATION, and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *ET AL*. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF ASHLI WATTS

I, Ashli Watts, declare based on personal knowledge as follows:

1.     I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.     I am the President and CEO of the Kentucky Chamber of Commerce.

3.     My business address is 464 Chenault Road, Frankfort, KY 40601.

4.     I have been employed by the Kentucky Chamber of Commerce for ten years, the first seven as the Vice President of Public Affairs, overseeing all advocacy, government affairs and communications and the last three as President and CEO, where I lead the Commonwealth's largest business association which supports a prosperous business climate in the Commonwealth of Kentucky and works to advance Kentucky through advocacy, information, program management and customer service in order to promote business retention and recruitment; oversee a $12M annual budget and over 50 employees; oversee all advocacy, education, membership and foundation efforts; and execute the strategic plan for the organization.

5.     The Kentucky Chamber of Commerce ("Chamber") is a non-profit organization founded in 1947 and located in Frankfort, Kentucky. The Chamber is the Commonwealth's largest business association and is a major catalyst, consensus builder and advocate for a thriving economic climate in Kentucky. It

2

represents the interests of more than 65,000 employers of every size, in every industry sector, and from every region of the Commonwealth. The Kentucky Chamber of Commerce supports a prosperous business climate in the Commonwealth of Kentucky and works to advance Kentucky through advocacy, information, program management and customer service in order to promote business retention and recruitment. The Chamber brings this action on behalf of its members.

6.   The Final Rule will injure Plaintiffs' members. Dozens of industries in which Plaintiffs' members operate will be adversely affected by the Final Rule, including but not limited to manufacturing, mining, asphalt production, food production, pulp and paper production, paint manufacturing, electricity production, energy development, water utilities, sand, stone, and gravel operations, road construction and maintenance, landfills, real estate development, railroads, industrial development, and agriculture.

7.   On behalf of its members, the Kentucky Chamber works to promote reasonable environmental regulations that provide businesses with a stable and predictable regulatory regime. The Kentucky Chamber achieves these efforts through federal and state legislative and regulatory processes, as well as in litigation.

3

**055 of 058**

8.     The Kentucky Chamber has filed comments on previous WOTUS rules, educated its members on the impact of the rule, and worked with state and federal leaders to mitigate the negative impact on Kentucky businesses.

9.     The Kentucky Chamber has advocated for the business community on Waters of the U.S. regulations for years including by supporting the United States Chamber of Commerce's comments on the 2021 proposal.. The Kentucky Chamber has engaged with members within the organization to determine the severity of the changes in the Final Rule and better understand its impact on members. The Kentucky Chamber is also preparing for discussions with members at an upcoming environmental conference.

10.     The Kentucky Chamber's membership is diverse. The Chamber represents manufacturers, developers, constructions companies, agriculture, infrastructure, logistics, health care, retail, and various service providing businesses. The nature of Kentucky's water resources means that development can often impact waters that could be Waters of the U.S. These types of businesses build manufacturer facilities, farm land, construct residential and multi-family housing and facilities that house businesses, and expand health care facilities. Further, infrastructure relating to roads, water and wastewater, and broadband can disrupt waterways that could be Waters of the U.S. In addition to the costs and delays related to construction of and upgrades to that infrastructure, some

4

businesses that are not specifically building or expanding in a way that would need

permitting related to Waters of the U.S., could still be negatively impacted as

delays to expanded or enhanced infrastructure could delay their business

operations. This is especially concerning given the rapid economic growth in the

state. At a time when new businesses are locating to and expanding in the state,

new regulations that delay the construction of infrastructure will be detrimental to

continued growth.

11.    The Kentucky Chamber has a long history of engaging on Water of

the U.S. policy as it changes, often with changes in the Administration. This

includes formulating and submitting comments on proposed rules, developing or

amending the organizations statement on Waters of the U.S. in the annual

Legislative Agenda, and holding plenary and panel discussions at two annual

conferences related to environmental regulation and permitting. These conferences

often involve EPA officials, attorneys, and environmental consultants attempting to

explain the latest version of the rule and how it should be applied. This education

is critical but often leads to more questions than answers. In our hyper litigious

environment, businesses are fearful of being sued or fined for not pursuing a

permit on a potential Water of the U.S. even if their proposed action does not

appear to impact waters or features that meet the definition. The initial step of just

determining if a water is a Water of the U.S. is daunting. This step can stymie

057 of 058

progress even before permitting is initiated. While the Kentucky Chamber can attempt to educate members on the new rule, it cannot give members assurances that a certain water is not a Water of the U.S. and that proceeding on with development won't end in fines, penalties, and lawsuits.

12.     Members of the Kentucky Chamber will need to spend resources on consultants or attorneys to investigate whether the water or wetland feature is a "water of the United States." If so, members will need to relocate or change projects or activities either to avoid permitting or submit an application for a permit where not previously needed. As a result, they will incur the costs related to that application and permit process, as well as costs to provide mitigation required to offset proposed impacts.

13.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of February 2023.

_Ashli Watts_

Ashli Watts

6

**058 of 058**