UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. 3:23-cv-00008-GFVT

| | |
|---|---|
| KENTUCKY CHAMBER OF COMMERCE; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; ASSOCIATED GENERAL CONTRACTORS OF KENTUCKY, INC.; HOME BUILDERS ASSOCIATION OF KENTUCKY; PORTLAND CEMENT ASSOCIATION; and GEORGIA CHAMBER OF COMMERCE, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

This case challenges the latest attempt by two federal agencies—the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively "the Agencies")—to define by rule the meaning of "waters of the United States" under the Clean Water Act ("CWA"). *See* Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"). That is an issue of indisputably far-reaching impact and importance, as it determines which of the millions of acres of private and state land in this country require federal permission to use them under the CWA. It is also an issue on which the Agencies have repeatedly overstepped their statutory authority and succeeded only in sowing confusion. The Supreme Court has twice rejected the Agencies' attempts to assert power over isolated and remote ponds and

1

wetlands. And when the Agencies tried again in 2015, the Sixth Circuit stayed the then-new-rule and two district courts found it unlawful before it was eventually repealed by the Agencies.

The question before this Court at this time is whether to maintain the status quo while this litigation proceeds. It should. All the factors for a preliminary injunction are present. Plaintiffs show below the requisite likelihood of success on the merits and will be irreparably injured absent an injunction, and at the same time, an injunction is in the public interest and will not harm the government defendants.

As to the merits, despite courts' having found the Agencies to have overreached on numerous previous occasions, the Agencies have still not gotten it right. The new rule exceeds the Agencies' authority in numerous respects by, among other things, introducing a new test that extends federal jurisdiction to any waters or wetlands that the Agencies decide—viewing them in combination with "similarly situated" waters—have a "significant nexus" to a navigable or interstate water. The rule commits that determination to the Agencies' virtually unfettered discretion, setting forth a complex multi-function, multi-factor analysis with minimal guidance as to how the Agencies should consider and weigh those elements. This allows regulators to sweep into federal jurisdiction vast numbers of small, isolated, and purely intrastate water features and wetlands. But the Supreme Court has said in several cases that the assertion of such broad authority, especially where it increases federal power in relation to the states, requires a clear statement from Congress. There is no such statement here. In fact, the rule's broad assertion of authority over isolated water features actually contravenes the statute's use of the word "navigable"—a word that the Supreme Court has specifically said *must* be given some meaning. The rule is also inconsistent with Supreme Court precedent on the meaning of "significant nexus,"

is arbitrary and capricious, and fails to comply with the notice-and-comment requirements of the Administrative Procedure Act ("APA").

The irreparable harm to Plaintiffs is indisputable. Plaintiffs are trade associations whose members include businesses in every industry sector, including mining, manufacturing, construction, real estate development, and agriculture, among many others. These businesses own property that includes waters that fall within the sweep of the rule, and undertake activities that inevitably impact those waters and land areas. So if the rule goes into effect on March 20, 2023, as it is scheduled to do, many of these businesses will need to expend unrecoverable time and money to attempt to decipher whether the rule—including its expansive recasting of the significant nexus test—impacts planned activities. And if there is an impact, those businesses will have to change significantly, or forgo altogether, certain activities to avoid newly identified jurisdictional water features. Or they must go through an expensive and time-consuming permitting process that may still require altering operations or plans. Specific examples of such harms to the Plaintiffs' members are set forth in the attached declarations.

What is more, the Agencies' new rule threatens to create even more confusion in an already uncertain area. It is notoriously "often difficult to determine whether a particular piece of property contains waters of the United States." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594 (2016). The new rule threatens to make what was difficult to predict essentially impossible. Worse, the Agencies expressly refuse to honor their previously approved jurisdictional determinations (identifying the presence or absence of waters of the United States on specific parcels of land), even while claiming to be bringing clarity and predictability to this area of law and regulation by issuing the new rule.

Finally, the public interest strongly favors a preliminary injunction that maintains the status quo, and the government defendants would suffer little to no harm from an injunction. Regarding the former, it is well-settled that there is no public interest in preserving an unlawful rule. So if this Court agrees that Plaintiffs have shown a likelihood of success on the merits, it follows that the public interest favors an injunction. But there is an additional reason for this conclusion. In a pending case, the Supreme Court is currently considering the legality of a core element of the rule: namely, whether a "significant nexus" test—in *any* form—is consistent with the text of the Clean Water Act. *Sackett v. EPA*. No. 21-454 (U.S. oral argument Oct. 3, 2022). Under the Supreme Court's regular practice, a decision is expected soon and no later than the end of June. It is not in the public interest to allow the rule to go forward when the Court's decision may effectively gut the rule in short order. And as for harm to the government defendants, the Agencies themselves argue (albeit incorrectly) that the rule does not change the status quo. So they cannot claim that an injunction would  harm the Agencies or the environment.

## BACKGROUND

### I. The CWA and "Waters of the United States"

In the CWA, Congress granted to EPA and the Corps limited authority to regulate the discharge of certain materials into "navigable waters," defined as "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7). *Id.* §§ 1341–1346. The CWA instructs the Agencies to protect the "integrity of the Nation's waters" and in so doing also to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." *Id.* § 1251(a), (b).

A party that discharges into "waters of the United States" must obtain a permit under the National Pollutant Discharge Elimination System program to discharge pollutants, *id.* § 1342, or under Section 404 for discharge of dredge and fill, *id.* § 1344. The CWA imposes strict civil

4

liability as well as criminal liability for those who discharge materials into "waters of the United States" without a permit. EPA can seek up to $56,460 each day for each discharge. 40 C.F.R. § 19.4 Tb. 1, 85 Fed. Reg. 83,818, 83,820 Tbl. 1 (Dec. 23, 2020). And those civil penalties can accrue for each day that a water feature is disturbed even before EPA becomes involved, i.e., "each day [the regulated party] wait[s] for the Agency to drop the hammer." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). In addition, a single negligent violation can result in imprisonment for up to one year, and a second negligent violation may result in two years of imprisonment. 33 U.S.C. § 1319(c)(1).

The Agencies have tried many times to define "waters of the United States" by rule. The Corps and EPA, in 1986 and 1988, respectively, defined "the waters of the United States" to include traditional navigable waters and their tributaries, wetlands adjacent to those waters and tributaries, and waters that are used in interstate commerce, which the Corps defined to include waters that serve as habitat for migratory birds. *See* 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988). In 2001, however, the Supreme Court invalidated the Corps' migratory bird rule as a basis of CWA jurisdiction. *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engin'rs*, 531 U.S. 159, 164 (2001) ("*SWANCC*") (quoting 51 Fed. Reg. at 41,217). The Court rejected the Corps' effort to "read[] the term 'navigable waters' out of the statute." *Id.* at 172. Critically, the Court held that "[t]he term 'navigable'" must be given some "effect," and thus, "has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 171–72.

Five years later, in *Rapanos v. United States,* 547 U.S. 715 (2006), the Supreme Court further rejected the government's assertion of jurisdiction based on a theory that wetlands or man-

made drains had a hydrologic connection to traditional navigable waters. The Court's majority consisted of two opinions. Five Justices agreed that the Agencies' "any hydrologic connection" theory went too far, but did not agree on the appropriate scope of "waters of the United States."

A four-Justice plurality opinion authored by Justice Scalia held that only "relatively permanent, standing or continuously flowing bodies of water," and waters with a "continuous surface connection" to such relatively permanent waters, qualify as "waters of the United States." *Id.* at 739–42 (plurality opinion). "Wetlands with only an intermittent, physically remote hydrologic connection" do not fall within the Agencies' jurisdiction. *Id.* at 742. The plurality explained that Congress' use of the definite article "the," along with the plural term "waters," indicates that Congress referred "not … to water in general" but "more narrowly" to "relatively permanent, standing or flowing bodies of water." *Id.* at 732. The opinion relied on the dictionary definition of "the waters" as referring to water "'[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,'" and excluding "ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 732–33.

Justice Kennedy provided the fifth vote against the government's assertion of jurisdiction, but on different grounds from the plurality. Writing separately and only for himself, Justice Kennedy reasoned that the Agencies' jurisdiction extends only to primary "traditional navigable waters" and secondary waters with a "significant nexus" to primary waters. *Id.* at 779 (Kennedy, J., concurring). To satisfy that nexus, secondary waters must "significantly affect the chemical, physical, and biological integrity of" primary waters. *Id.* at 780. The government's hydrologic connection theory swept farther than that.

Following *Rapanos*, the Agencies issued new guidance rather than issuing a new rule. U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the

6

U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States* (Dec. 2, 2008).[1] The "Rapanos Guidance" asserted per se jurisdiction over certain categories of waters that were included in the 1986 regulations, such as waters that were used or could be used in interstate commerce and interstate waters. The Agencies also asserted case-by-case jurisdiction over non-navigable tributaries that are not relatively permanent, and certain adjacent wetlands, if they were found to have a "significant nexus"—the term used by Justice Kennedy in his solo concurrence. The Guidance defined significant as more than speculative or insubstantial. There has been widespread agreement that the Guidance did not provide stakeholders with sufficient guidance. *See, e.g.,* 80 Fed. Reg. 37,054, 37,056 (June 29, 2015) ("[the Rapanos] guidance document[]. . . did not provide the public or agency staff with the kind of information needed to ensure timely, consistent, and predictable jurisdictional determinations").

Seven years later, the Agencies attempted a new rulemaking. In 2015, they published a final rule entitled "Clean Water Rule: Definition of 'Waters of the United States,'" 80 Fed. Reg. 37,054–127 (June 29, 2015) ("2015 Rule"), that was based on an expansive reading of Justice Kennedy's significant nexus standard. *Id.* at 37,057. But as a result of a nationwide stay and two preliminary injunctions, the 2015 Rule never went into effect across the country before the Agencies rescinded it in 2019. *See In re EPA*, 803 F.3d 804, 805 (6th Cir. 2015), *order vacated by In re U.S. Dep't of Def.*, 713 F. App'x 489, 490 (6th Cir. 2018) (lifting stay in light of *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018), which held that district courts had original jurisdiction over challenges to the 2015 Rule); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018); *North Dakota v. U.S. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015). In rescinding the 2015

---

[1] https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

Rule, the Agencies reinstated the pre-*Rapanos* regulations as informed by the Rapanos Guidance—a regime often called the 1986 regulatory regime or the pre-2015 regime. Definition of ''Waters of the United States''—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

The Agencies then adopted another rule—the Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR")—which was designed to be consistent with both the *Rapanos* plurality and Justice Kennedy's test. 85 Fed. Reg. at 22,262. But the NWPR was also challenged in various federal district courts, and a new Administration requested voluntary remand. Two courts went beyond that request and vacated and remanded the NWPR, without evaluating the merits of the rule. *Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949, 957 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164, 1170 (D.N.M. 2021). Neither decision was reviewed on appeal. *But see In re Clean Water Act Rulemaking*, __ F.4th __, No. 21-16958, 2023 WL 2129631 (9th Cir. Feb. 21, 2023) (holding that a court cannot vacate a regulation without first holding it unlawful). After those decisions, the Agencies halted implementation of the NWPR and returned once again to the pre-2015 regime.[2]

## II.     The Agencies publish the Final Rule.

On December 7, 2021, the Agencies published in the Federal Register a proposed rule entitled "Revised Definition of 'Waters of the United States'" 86 Fed. Reg. 69,372–450 (Dec. 7, 2021) ("Proposed Rule"). Among other things, the Proposed Rule introduced a new version of the significant nexus standard and used it for the first time to sweep into federal jurisdiction so-called "other waters"—a broad category of waters and features that had not been previously treated as jurisdictional. *Id.* at 69,418. The Proposed Rule asserted jurisdiction over "other waters" (i.e., intrastate lakes and ponds, streams, or wetlands that do not fall into the other categories) that

---

[2]     EPA, Current Implementation of Waters of the United States, https://www.epa.gov/wotus/about-waters-united-states#Current (last visited Feb. 19, 2023).

"either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of a traditional navigable water, interstate water, or the territorial seas." *Id.* The Agencies proposed to define "significantly affect" to mean "more than speculative or insubstantial effects." *Id.* at 69,449.[3]

Shortly after the Proposed Rule was issued, the Supreme Court granted certiorari in *Sackett v. EPA*, 142 S. Ct. 896 (Jan. 24, 2022), to decide "[w]hether the [U.S. Court of Appeals for the] Ninth Circuit set forth the proper test for determining whether wetlands [are] 'waters of the United States' under the Clean Water Act, 33 U.S.C. § 1362(7)." *Id.* The Ninth Circuit had expressly "appl[ied] Justice Kennedy's 'significant nexus' inquiry to evaluate whether EPA has jurisdiction to regulate the Sacketts' property." *Sackett v. U.S. EPA*, 8 F.4th 1075, 1091 (9th Cir. 2021). The case was argued on October 3, 2022, and was the first case of the Term. A decision has not yet issued.

Not content to wait for the Supreme Court, EPA and the Corps released the Final Rule on January 18, 2023. Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"). The Agencies claim that the Final Rule codifies the pre-2015 regulatory regime, and thus, provides certainty and predictability with de minimis costs. *Id.* at 3007. In fact, the Final Rule changes the tests for jurisdiction in several ways and expands the Agencies' reach.

The Final Rule interprets "waters of the United States" to include five categories of waters:

- traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");

---

[3] The U.S. Chamber of Commerce (of which the Georgia and Kentucky Chambers are members), the Georgia Chamber of Commerce, and the Portland Cement Association submitted comments on the Proposed Rule. Durbin Decl. ¶ 8; Perry Decl. ¶ 7; Baer Decl. ¶ 7. The U.S. Chamber of Commerce and the Portland Cement Association also joined industry coalition comments. Durbin Decl. ¶ 8; Baer Decl. ¶ 7. The Associated General Contractors, of which the Associated General Contractors of Kentucky is a chapter, submitted comments. Vincent ¶ 7.

- impoundments of "waters of the United States" ("paragraph (a)(2) impoundments");

- tributaries to traditional navigable waters, the territorial seas, interstate waters, or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries");

- wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and

- intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

33 C.F.R. § 328.3(a)(1)–(5).

In a departure from pre-2015 agency practice, the Final Rule includes all "interstate waters" as paragraph (a)(1) waters regardless of whether those waters are navigable and includes other waters based on a connection to those "interstate waters."

Moreover, the final three categories—tributaries, adjacent wetlands, and other waters— incorporate a new and expanded version of Justice Kennedy's significant nexus test to determine jurisdiction. According to the Final Rule, waters meet the Agencies' version of the significant nexus test where they "either alone or in combination with similarly situated waters in the region significantly affect the chemical, physical, *or* biological integrity of" another water. *Id.* § 328.3(a)(3)(ii), (4)(iii), (5)(ii) (emphasis added). Waters are "similarly situated" if they serve common or similar functions and are in the same "catchment area." 88 Fed. Reg. at 3088, 3097. And in a significant change from the proposal, the Final Rule defines the term "significantly affect" as having "a material influence." 33 C.F.R. § 328.3(c)(6).

10

To determine whether this standard is met, the Agencies will "assess[]" five functions and "consider[]" five factors. *Id.* The functions to be assessed are the "[c]ontribution of flow;" "[t]rapping, transformation, filtering, and transport of materials (including nutrients, sediment, and other pollutants);" "[r]etention and attenuation of floodwaters and runoff;" "[m]odulation of temperature;" and "[p]rovision of habitat and food resources for aquatic species located in waters." *Id.* The factors to be considered are "[t]he distance from a [paragraph (a)(1) water];" "[h]ydrologic factors, such as the frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow;" "[t]he size, density, or number of waters that have been determined to be similarly situated;" "[l]andscape position and geomorphology;" and "[c]limatological variables such as temperature, rainfall, and snowpack." *Id.* The Final Rule provides little guidance on how these functions and factors are to be balanced.

The Final Rule also makes clear that the Agencies do not intend to honor approved jurisdictional determinations ("AJDs") made under the 2020 NWPR. It incorporates "previous public statements that NWPR AJDs, unlike AJDs issued under other rules that were changed pursuant to notice-and-comment rulemaking rather than vacatur, may not reliably state the presence, absence, or limits of 'waters of the United States' on a parcel and will not be relied upon by the Corps in making new permit decisions." 88 Fed. Reg. at 3136.

## ARGUMENT

This Court should preliminarily enjoin the Final Rule and maintain the status quo while this litigation proceeds. Courts

> consider four factors in determining whether a preliminary injunction should issue: (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest.

*Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023). Each is satisfied here. Indeed, in *In re EPA*, the Sixth Circuit applied a similar standard in staying the similarly overbroad 2015 Rule. 803 F.3d at 806.

## I.       Plaintiffs are likely to succeed on the merits.

"To satisfy th[e] [first] factor, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Stryker Emp't. Co. v. Abbas*, __ F.4th __, No. 22-1563, 2023 WL 2028701, at *9 (6th Cir. Feb. 16, 2023) (internal quotation marks omitted). In *In re EPA*, for example, the court of appeals granted a stay of the 2015 Rule where the petitioners had "demonstrated a substantial possibility of success." 803 F.3d at 807.

Plaintiffs need to make this likelihood-of-success showing on at least one of the grounds pleaded in the Complaint, but need not do so for all of them. *See id.*; *see also Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 599 F. Supp. 3d 497, 506 (W.D. Ky. 2022) ("The moving party need only show a likelihood of success on the merits of one claim where there are multiple claims at issue in the complaint."). For that reason and in the interest of economy, Plaintiffs highlight below only a few of the reasons why they have an adequate likelihood of success on the merits, and reserve argument on the remainder.

## A.       The Final Rule exceeds the Agencies' statutory authority as not authorized by a clear statement from Congress, and by reading "navigable" out of the statute.

The Final Rule exceeds the Agencies' statutory authority in at least two ways. To begin with, it asserts sweeping powers that are not clearly authorized by Congress, even though such authorization is required by both the Supreme Court's decision in *SWANCC* and the Court's more recent decision in *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In addition, it reads the phrase "navigable waters" out of the CWA.

*First*, because of its impacts on state and local powers, the Final Rule does not pass muster under *SWANCC*. In that case, the Agencies claimed federal jurisdiction "over ponds and mudflats falling within the 'Migratory Bird Rule'" that "would result in a significant impingement of the States' traditional and primary power over land and water use." 531 U.S. at 174. The Court explained that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result," *id.* at 172, especially "where the administrative interpretation alters the federal-state framework, *id.* at 173. And because there was "nothing approaching a clear statement from Congress," the Court "reject[ed] the [Agencies'] request for administrative deference" to its claim of jurisdiction. *Id.* at 174. So too here. The Final Rule's recasting of the significant nexus standard sweeps into federal jurisdiction vast numbers of small, isolated, and purely intrastate water features and wetlands, *infra* pp. 14–16, sharply upsetting the balance between state and federal authority to regulate land use.

Similarly, in *West Virginia*, the Court explained that "there are 'extraordinary cases' . . . in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 2608. "To overcome that skepticism, the Government must—under the major questions doctrine—point to 'clear congressional authorization' to regulate in that manner." *Id.* at 2614. The Final Rule's application of the significant nexus standard falls squarely within that doctrine. As noted below, it asserts federal jurisdiction over a very large array of small, isolated, and purely intrastate water features and wetlands. *Infra* pp. 14–18. This immense expansion of federal jurisdiction, in turn, has a significant economic impact because of the tremendous compliance costs that result from each finding of jurisdiction. *Infra* pp. 21–22. The Final Rule also has political significance—as shown

13

by the decades of debate over this issue between Congress, the courts, the executive branch, and the states. *Supra* p. 4–7.

Under both cases, the Final Rule fails because it is not authorized by a clear statement from Congress. The words "significant nexus" appear nowhere in the statute. And whatever else one might say about the matter, the term "navigable waters" does not clearly mean that land or water features with a "significant nexus" to such waters are encompassed within the term.

***Second***, the Final Rule not only lacks clear authorization, it reads the phrase "navigable waters" out of the CWA, in direct contravention of another aspect of *SWANCC*. The Supreme Court explicitly rejected the Corps' effort to "read[] the term 'navigable waters' out of the statute," holding that "[t]he term 'navigable'" must be given some "effect." 531 U.S. at 172. But the Final Rule does exactly that—and explicitly so. It asserts categorical jurisdiction over "interstate waters" "*regardless of their navigability*." 88 Fed. Reg. at 3072 (emphasis added). And in practical effect, this sweeps in the same sort of isolated, non-navigable, but technically interstate ponds over which the Supreme Court rejected jurisdiction in *SWANCC*. 531 U.S. at 170–73. The Final Rule also effectively reads "navigable" out of the statute through its expansive rendition of the "significant nexus" test. As discussed in more detail below, that vague, standardless, multi-function, multi-factor standard gives regulators unpredictable and virtually unfettered discretion to assert jurisdiction over all manner of isolated waters and wetlands that have, at best, an insubstantial effect on traditional navigable waters.

**B.    The Agencies' version of the significant nexus standard is, in any event, unlawful.**

Plaintiffs also are likely to succeed on the merits because the Agencies' new version of the significant nexus standard is inconsistent with Justice Kennedy's *Rapanos* opinion in several ways.

First, the Final Rule exceeds Justice Kennedy's opinion because it allows the Agencies to find a significant nexus based on the aggregation of "similarly situated" waters across a vast region. Justice Kennedy recognized that "[w]here an adequate nexus is established *for a particular wetland*, it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region." *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring) (emphasis added). But the Final Rule would allow the Agencies to first gather up as many wetlands as possible in a broadly defined region *and then use that amalgamation* to find a significant nexus, instead of first establishing such a nexus for any particular wetland. 88 Fed. Reg. at 3,088. That notable inconsistency with Justice Kennedy's opinion is highlighted by the observation that an aggregation approach would allow the Agencies to assert jurisdiction over a water that has only a speculative or insubstantial effect by aggregating (combining) that effect with the effects of other waters in a vast region and declaring that combined effect "substantial." Justice Kennedy expressly rejected jurisdiction based on "speculative or insubstantial" effects. *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring).[4]

Second, the Final Rule is inconsistent with Justice Kennedy's opinion because it applies the "significant nexus" test to many types of waters—tributaries, lakes, ponds, and streams, 33 C.F.R. §§ 328.3(a)(3), (a)(5)—to which Justice Kennedy's test did not apply. Justice Kennedy's test applied only "[w]ith respect to wetlands." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring in the judgment). The standard made sense for wetlands, he explained, because "wetlands can

---

[4] Moreover, under the Final Rule, aggregated waters do not even have to have similar functions, but simply must be located within a catchment area. That, too, is inconsistent with Justice Kennedy's opinion, which focused on the fact that "wetlands can perform critical functions." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring).

perform critical functions related to the integrity of other waters," and thus, "significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 779–80.

Third, the Final Rule bases the significant nexus evaluation on a multi-function and multi-factor test with little guidance. To start, the Final Rule includes many factors that Justice Kennedy did not indicate were part of the significant nexus analysis. Although Justice Kennedy discussed the fact that wetlands can perform functions, such as "pollutant trapping, flood control, and runoff storage," related to the integrity of other waters, he did not suggest that these functions could alone, or even when combined with other factors, establish a significant nexus. *Id.* at 779. Moreover, the Final Rule appears to allow for jurisdiction based on even a single factor. As a result, the Agencies could find jurisdiction in ways Justice Kennedy expressly rejected as sufficient, standing alone, to establish a significant nexus. For example, one of the Final Rule's functions is the "[c]ontribution of flow," but Justice Kennedy specifically rejected the idea that "[t]he merest trickle, if continuous" would be sufficient to establish a significant nexus. *Id.* at 769; 33 C.F.R. § 328.3(c)(6)(i)(A).

These differences from Justice Kennedy's opinion should alone be fatal, but are particularly egregious when considered together with the grant of certiorari in *Sackett*. In *Sackett*, the Ninth Circuit had "appl[ied] Justice Kennedy's 'significant nexus' inquiry to evaluate whether EPA has jurisdiction to regulate the Sacketts' property." *Sackett*, 8 F.4th at 1091. The Supreme Court, in turn, granted review to decide "[w]hether the [U.S. Court of Appeals for the] Ninth Circuit set forth the proper test for determining whether wetlands [are] 'waters of the United States' under the Clean Water Act, 33 U.S.C. § 1362(7)." *Sackett*, 142 S. Ct. at 896. And yet the Agencies have chosen to charge ahead with aggressively regulating based on a new understanding of "significant nexus" that is broader than Justice Kennedy's. Any use of the "significant nexus" test

16

in the CWA context—and even more so, any refashioning and expansion of that test—should at least await the Court's decision in *Sackett*.

### C.   The Final Rule is arbitrary and capricious for failure to include a reasoned explanation for the substantial changes to current regulation that are made therein.

Plaintiffs also will succeed in showing that the Final Rule must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). It is well settled that a rule is arbitrary and capricious if the agency has not provided a reasoned explanation for its actions. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (per curiam). In particular, a regulator's decision to make a change in course is not a reasoned explanation where the regulator incorrectly claims that the agency is not changing course. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). Here, the Final Rule fails to provide an adequately reasoned explanation because, among other things, the Agencies mistakenly characterize the Final Rule as codifying the pre-2015 regulatory regime when, in fact, it introduces a substantially different regime.

The Agencies claim that the Final Rule provides certainty and predictability and imposes de minimis costs because it merely codifies the well-known pre-2015 regulatory regime. 88 Fed. Reg. at 3007. Those assertions, however, are contrary to reality. The Final Rule in fact significantly differs from the pre-2015 regulatory regime by allowing for jurisdiction based on a broad and new articulation of the significant nexus standard. The 1986 regulations did not even use the concept of significant nexus, because such a standard had not been articulated yet. And while the Rapanos Guidance allowed for significant-nexus-based jurisdiction, it did so *only* for tributaries and

17

adjacent wetlands. *See* 33 C.F.R. § 328.3(a)(1)–(5). The Final Rule goes much farther, applying the significant nexus standard to a new and broadly articulated class of "other waters," including wholly "[i]ntrastate lakes and ponds, streams, [and] wetlands," *id.*, a category over which the Agencies candidly admit they had not previously been asserting jurisdiction. 88 Fed. Reg. at 3102–03. What is more, the Final Rule changes the significant nexus standard in the Rapanos Guidance from "significantly affect the chemical, physical, *and* biological integrity" to "chemical, physical, *or* biological integrity," 33 U.S.C. § 328.3(c)(6) (emphasis added). That standard sweeps in more water features and departs from Justice Kennedy's opinion in *Rapanos*, which uses "and" and not "or" in this regard, *see* 547 U.S. at 780 (Kennedy, J., concurring in the judgment)). In short, the Final Rule represents an indisputable change from the pre-2015 regime. It is black-letter administrative law that such a change must be acknowledged and explained. *See Fox Television Stations, Inc.*, 556 U.S. at 515; *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017) ("Blinders may work for horses, but they are no good for administrative agencies."). The Agencies' claim otherwise fails their duty to explain the nature and consequences of their administrative action, and accordingly, the Final Rule must be set aside as "arbitrary [and] capricious." *See* 5 U.S.C. § 706(2)(A); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (cleaned up).

But that is not the only reason why the Final Rule is arbitrary and capricious. The unacknowledged changes from the pre-2015 regime grant the Agencies significant subjectivity in making case-by-case significant-nexus determinations based on the novel multi-factor, multi-function analysis. *See* 33 C.F.R. § 328.3(c)(6). The functions to be assessed are the "[c]ontribution of flow;" "[t]rapping, transformation, filtering, and transport of materials (including nutrients,

18

sediment, and other pollutants);" "[r]etention and attenuation of floodwaters and runoff;" "[m]odulation of temperature;" and "[p]rovision of habitat and food resources for aquatic species located in waters." *Id.* The factors to be considered are "[t]he distance from a [paragraph (a)(1) water];" "[h]ydrologic factors, such as the frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow;" "[t]he size, density, or number of waters that have been determined to be similarly situated;" "[l]andscape position and geomorphology;" and "[c]limatological variables such as temperature, rainfall, and snowpack." *Id.* There is simply nothing in the Final Rule that would prevent a regulator, exercising virtually unfettered discretion in how to weigh and balance these various factors and functions, from asserting jurisdiction over vast numbers of usually dry channels and isolated waters.

These changes from the pre-2015 regulatory regime belie the Agencies' claims of certainty, predictability, and de minimis costs, further rendering those claims arbitrary and inadequate for APA purposes. At a minimum, landowners must incur substantial time and expense to decipher the new tests. And when they do, the reality is that they won't come to any clear answers. The Agencies claim that the use of various resources such as "USGS stream gage data, floodplain maps, statistical analyses, hydrologic models and modeling tools," among many others, will make the process easier. 88 Fed. Reg. at 3130. Perhaps so—if one has the training and know-how to understand and use these tools without hiring expensive consultants. That is not the case for the vast majority of landowners, including farmers, homeowners, and businesses, who will have to incur major costs to do what the new rule now requires. Even then, there's no way to crack the final code—how the regulator will exercise its discretion in weighing the functions and factors, identifying and aggregating "similarly situated" waters in a "catchment area," and ultimately determining what constitutes a "material effect." When faced with the prospect of significant civil

and criminal penalties, landowners and businesses will inevitably err in favor of incurring greater expense and abstaining from economically valuable activity to avoid liability risk.

> **D.**     **The Final Rule is not a logical outgrowth of the proposal, and thus fails the APA's notice-and-comment requirement.**

Finally, Plaintiffs are likely to succeed in showing the Final Rule fails to satisfy the notice-and-comment requirement of the APA. 5 U.S.C. § 553. Notice and opportunity to comment is critical to ensuring "meaningful participation and informed decisionmaking." *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (per curiam). To satisfy that requirement, an agency must not only provide a nominal opportunity for notice and comment; the agency must ensure that the final version of a rule is a "'logical outgrowth'" of its proposal. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The Final Rule is not.

The "logical outgrowth" test asks whether the agency has "describe[d] the range of alternatives being considered with reasonable specificity," such that interested parties will "know what to comment on." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). For example, in *Small Refiner*, the D.C. Circuit vacated an EPA rule that restricted emissions and provided a different standard for small refiners, in part based on a "past ownership requirement" that EPA never discussed in its proposal. *Id.* at 548. EPA contended that "it gave general notice that it might make unspecified changes in the definition of small refinery." *Id.* at 549. The D.C. Circuit rejected this argument, explaining that EPA was required not just to suggest it might make unspecified changes but to discuss the range of options being considered. *Id.*; *see also Horsehead Res. Dev.*, 16 F.3d at 1268 ("[G]eneral notice that a new standard will be adopted affords the parties scant opportunity for comment.").

Here, the Agencies failed to provide notice that they were considering changes to a definition that is critical to the scope of the Final Rule. The Final Rule bases jurisdiction for

numerous waters, including the new "other waters" category, on whether they "significantly affect" the "chemical, physical, or biological integrity" of other waters. 33 C.F.R. § 328.3(a)(5). The definition of "significantly affect" accordingly plays a major role in determining the scope of the Final Rule, *supra* pp. 14–18, but the agencies changed it without adequate notice and opportunity to comment. In the Proposed Rule, the Agencies defined "significantly affect" to mean "more than speculative or insubstantial effects." 86 Fed. Reg. at 69,449. But in the Final Rule, the Agencies changed the definition of "significantly affect" to "a material influence," 33 C.F.R. § 328.3(c)(6).

This plainly violates the logical outgrowth doctrine. The Agencies did not provide notice of the range of alternative definitions that they were considering in the Proposed Rule. They did not even provide "general notice that [they] might make unspecified changes" to that definition as EPA did in *Small Refiner*. 705 F.2d at 549. Instead, the Agencies provided no notice whatsoever that they were considering changing a critical definition in the Final Rule, and the public was denied a meaningful opportunity to comment. Had Plaintiffs had notice, they could have, for example, suggested more stringent standards, such as "seriously impairs" or "substantially alters."

## II.    The plaintiffs will suffer irreparable harm absent a preliminary injunction.

The Final Rule imposes irreparable harm on Plaintiffs and their members. Plaintiffs' members own land, or work on land, that includes features that may constitute "waters of the United States" under the Final Rule. If the Final Rule takes effect, Plaintiffs' members will need to immediately assess whether water features on their property are jurisdictional under the Final Rule's new standards. This will begin with expending time and resources just on figuring out what the new standards mean. And this is true even if they have a jurisdictional determination ("JD") that was approved under the previous rule (the 2020 NWPR), because the Final Rule makes clear that the Agencies do not intend to honor those JDs, notwithstanding private parties' reliance on

(and investments made in obtaining) them.[5] 88 Fed. Reg. at 3136. If there might be an impact on ongoing or planned activities, those affected members will need to undertake the cumbersome process of obtaining a jurisdictional determination, which requires hiring consultants to conduct the required analysis. *See* Durbin Decl. ¶¶ 13–14; Perry Decl. ¶ 10; Vincent Decl. ¶ 10; Watts Decl. ¶ 12. To the extent that waters are newly jurisdictional under the Final Rule, members will be required either to change their plans or activities or to obtain relevant permitting approvals, which can take years and cost tens of thousands or hundreds of thousands of dollars (and can still require changes to plans or activities).[6] *See* Durbin Decl. ¶¶ 13–14; Perry Decl. ¶ 10; Vincent Decl. ¶ 11; Watts Decl. ¶ 12. Non-compliance risks civil and criminal penalties, as well as citizen suits based on the Final Rule.

For example, one member and its independent operating subsidiaries have at least three permitted projects that involve ephemeral or intermittent streams as well as small isolated wetlands, and are likely to be affected by the Rule. Heck Decl. ¶¶ 10, 13. Based in part on the changing and inconsistent definitions of "waters of the United States," the member and its

---

[5] This is no small matter. An approved JD determining that a parcel contains *no* jurisdictional waters is supposed to grant private parties "a five-year safe harbor" from civil enforcement by the Agencies. *Hawkes*, 578 U.S. at 598-99; *see also id.* at 602-03 (Kennedy, J., concurring, joined by Thomas and Alito, JJ.) ("An approved [JD] gives a landowner at least some measure of predictability, so long as the agency's declaration can be relied upon. … [T]he Court is right to construe a JD as binding in light of the fact that in many instances it will have a significant bearing on whether the Clean Water Act comports with due process.  The Act, especially without the JD procedure were the Government permitted to foreclose it, continues to raise troubling questions regarding the Government's power to cast doubt on the full use and enjoyment of private property throughout the Nation.").

[6] David Sunding & Gina Waterfield, Review of the Environmental Protection Agency and Department of the Army 2021 Economic Analysis for the Proposed "Revised Definition of 'Waters of the United States'" Rule at 12 (Feb. 7, 2022), https://www.ipaa.org/wp-content/uploads/2022/02/2022-WAC-Final-Exhibit-10.pdf (permitting costs "range from $3,100 to $217,600 for general permits and from $10,900 to $2,376,800 for individual permits in 2020 dollars.").

subsidiaries have had to withdraw and resubmit permit applications, causing significant project delays. *Id.* ¶ 16. For one project, the company estimates that the fees to satisfy compensatory mitigation are anticipated to rise by greater than 75%, which could change the company's decision-making regarding the project or render earlier decisions considerably more expensive. *Id.* ¶ 17.

Another member is a pork producer that also grows crops used to feed pigs on the farms. O'Bryan Decl. ¶ 6. The farms contain ephemeral streams, ditches, and other water features. *Id.* ¶ 8. The member will need to hire consultants and attorneys to determine whether current and future farming activities, involving currently disputed water features and water features not previously considered jurisdictional, will be affected by the Final Rule. *Id.* ¶ 16. And if those features are now jurisdictional, the member will need to spend time and resources to assess whether the farming operations should be changed, whether a permit is required, and if so what type of permit will be necessary. *Id.*

A third member is planning a rail expansion project designed to move material in and out of its property in a more environmentally sustainable way. Mitchell Decl. ¶ 15. That project could impact ephemeral streams or isolated wetlands on the property that may be jurisdictional under the Final Rule, but were not previously. *Id.* ¶ 15. The Final Rule presents a particular challenge because many of the water features on the property are fed by groundwater, and the Final Rule's significant nexus test contemplates jurisdiction based on a subsurface hydrologic connection. *Id.* ¶¶ 7, 13. As a result, the member will need to hire consultants to assess, among other things, how its project design will fit within acreage thresholds for an existing nationwide permit, whether it will need to seek an individual permit, and what mitigation will be required. *Id.* ¶ 17.

Finally, a different member has a number of projects that may be affected by the Final Rule, including a 266-acre industrial real estate property that is currently being marketed for a

corporate headquarters or other significant business operation that would provide hundreds of jobs. Tollison Decl. ¶ 11. Over the last 25 years, the federal-jurisdictional wetlands acreage on the property has changed several times. *Id.* The acreage began at 8.82 acres in 1996, and then significantly increased to 51.73 acres in 2016. *Id.* Under the NWPR, the acreage fell to 24.58 acres. *Id.* Because the Final Rule indicates that AJDs issued under the NWPR cannot be relied upon, the member will need to obtain a new AJD to obtain a permit to develop the property. *Id.* ¶ 12. That AJD will likely classify even more of the property as jurisdictional wetlands. *Id.*

What is more, the effects of the Rule are not limited to property owners who want to use or develop land that has water features or wetlands. For example, one member is a bridge demolition company that serves as a subcontractor for public-works contracts. Stout Decl. ¶¶ 4–5. The company has more than twenty bridges currently under contract for demolition that could be affected by the Rule. *Id.* ¶¶ 8–9. When the company submits a bid to a general contractor, it does so based on specific means and methods designed around certain parameters, which are dictated by approved CWA permits or pending permit applications. *Id.* ¶ 9. By introducing new tests for jurisdictional waters, the Rule will likely trigger additional analysis and introduce uncertainty, changed parameters, and increased costs into the already agreed-upon and planned-for projects.

Plaintiffs' members thus will suffer a variety of irreparable harms. These include forgone opportunities due to delays and changed projects or activities, none of which can be recouped. Lost time, of course, is the paradigmatic irreparable harm. In addition, as the Sixth Circuit recently held, money spent complying with a regulation is unrecoverable because of the federal government's sovereign immunity. *Kentucky v. Biden*, 57 F.4th at 556; *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part).

### III.   The balance of the hardships and the public interest weigh in favor of granting the preliminary injunction.

The public interest strongly favors a preliminary injunction that maintains the status quo. As explained, the Final Rule is very likely to be found unlawful because it is inconsistent with the text of the CWA, and in any event, inconsistent with Justice Kennedy's concurrence and arbitrary and capricious in violation of the APA. The public has no interest in preserving an unlawful rule. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). To the contrary, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

But perhaps most compelling is the Supreme Court's pending *Sackett* case, in which the Supreme Court is indisputably confronted with the legality of a core element of the Final Rule. There is no plausible argument that it would serve the public interest to allow the Final Rule to take effect on March 20 for, at most, three months before the Supreme Court rules. The range of possible outcomes of such a scenario illustrates why it makes no sense. In the worst case for the Agencies, the Supreme Court's decision would effectively gut the Final Rule and render a complete waste all the effort undertaken to comply with and carry out the Final Rule between March 20 and some date before the end of June. In the best case for the Agencies, the Supreme Court's decision would leave the Final Rule untouched (while also leaving untouched the majority of the claims asserted here), and the public and the Agencies would have gained at most a three-month "head-start" on a rule that is unlawful anyway. The public interest strongly favors a stay pending at least the Supreme Court's resolution of the *Sackett* case.[7] As the Sixth Circuit explained

---

[7] Of course, this Court has authority to reevaluate an injunction at any time, including when the Supreme Court issues its *Sackett* decision, and order additional briefing as necessary.

in staying the similarly flawed 2015 predecessor of the Final Rule, "[a] stay temporarily silences the whirlwind of confusion that springs from uncertainty about the requirements of the new Rule and whether they will survive legal testing." *In re EPA*, 803 F.3d at 805.

The Agencies also would suffer little to no harm from an injunction. The Agencies themselves argue (albeit incorrectly) that the Final Rule does not change the status quo. So from their perspective, an injunction that preserves the status quo should impose no practical harms on the Agencies or the environment. Indeed, allowing the Final Rule to go forward might be more harmful to the Agencies. If the Final Rule is found unlawful and unwound, it is not only the regulated entities whose time and substantial resources will have been wasted, but the regulators, too. As the Sixth Circuit noted in staying the 2015 "Waters of the United States" rule, "the sheer breadth of the ripple effects caused by the Rule's definitional changes counsels strongly in favor of maintaining the status quo for the time being." 803 F.3d at 805.

## CONCLUSION

The motion for a preliminary injunction should be granted.

Dated:  February 22, 2023                          /s/ *Charles E. English, Jr.*

Charles E. English, Jr. ("Buzz")
Sarah P. Jarboe
LaJuana S. Wilcher
English, Lucas, Priest & Owsley, LLP
1101 College Street; P.O. Box 770
Bowling Green, KY 42102-0770
(270) 781-6500
benglish@elpolaw.com
lwilcher@elpolaw.com
sjarboe@elpolaw.com

Elbert Lin (*pro hac vice pending*)
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com

Matthew Z. Leopold (*pro hac vice pending*)
Kerry L. McGrath (*pro hac vice pending*)
Erica N. Peterson (*pro hac vice pending*)
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
mleopold@HuntonAK.com
kmcgrath@HuntonAK.com
epeterson@HuntonAK.com
*Counsel for Plaintiffs Kentucky Chamber of
Commerce, Chamber of Commerce of the United
States of America, Associated General Contractors
of Kentucky, Inc., Home Builders Association of
Kentucky, Portland Cement Association, and
Georgia Chamber of Commerce*

Andrew R. Varcoe (*pro hac vice pending*)
Stephanie A. Maloney (*pro hac vice pending*)
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
avarcoe@USChamber.com
smaloney@USChamber.com
*Counsel for Plaintiff Chamber of Commerce of the
United States of America*

27